## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>ex rel. [SEALED], | ) ) ) ) | |
| Plaintiffs, | ) ) | **COMPLAINT** |
| v. | ) ) | **DEMAND FOR JURY TRIAL** |
| [SEALED], | ) ) | **FILED IN CAMERA AND UNDER SEAL** |
| Defendants | ) ) ) | |

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>ex rel. RUSSELL BRIMER and<br>WHITNEY LEEMAN,<br>400 Capitol Mall<br>Sacramento, CA 95814 | )<br>)<br>)<br>)<br>)<br>) | |
|          Plaintiffs, | )<br>) | **COMPLAINT** |
|    v. | )<br>) | **DEMAND FOR JURY TRIAL** |
| ARAMARK CORPORATION<br>1101 Market Street<br>Philadelphia, PA  19107; | )<br>)<br>)<br>) | **FILED IN CAMERA AND**<br>**UNDER SEAL** |
| BUSINESS INNOVATIONS<br>WORLDWIDE, LLC<br>6579 Peachtree Industrial Boulevard<br>Norcross, GA  30092; | )<br>)<br>)<br>)<br>) | |
| CAPSCO INCORPORATED<br>5107 Berwyn Road, Suite C<br>College Park, MD  20740; | )<br>)<br>)<br>) | |
| CATSTUDIO<br>1340 Industrial Avenue, Suite A<br>Petaluma, CA  94952; | )<br>)<br>)<br>) | |
| CUSTOM SOUVENIR & NOVELTY<br>5215 Wellington Avenue<br>Ventnor City, NJ  08406; | )<br>)<br>)<br>) | |
| DELAWARE NORTH COMPANIES<br>INCORPORATED<br>40 Fountain Plaza<br>Buffalo, NY  14202; | )<br>)<br>)<br>)<br>) | |
| DESIGN MASTER<br>ASSOCIATES, INCORPORATED<br>3005 John Deere Road<br>Toano, VA  23168; | )<br>)<br>)<br>)<br>)<br>) | |

```
GUEST SERVICES, INCORPORATED           )
3055 Prosperity Avenue                 )
Fairfax, VA  22031;                    )
                                       )
JENKINS ENTERPRISES, INCORPORATED      )
4949 W. Bethany Road                   )
North Little Rock, AR  72231;          )
                                       )
KAPAN-KENT COMPANY, INCORPORATED       )
2675 Vista Pacific Drive               )
Oceanside, CA  92056;                  )
                                       )
SILBERNE SOUVENIR SALES,               )
INCORPORATED                           )
2142 Queens Chapel Road, N.E.          )
Washington, D.C.  20018;               )
                                       )
SMITH NEWS COMPANY, INCORPORATED/      )
SMITH NOVELTY COMPANY                  )
460 Ninth Street                       )
San Francisco, CA  94103;              )
                                       )
SMITH-WESTERN COMPANY                  )
2223 S. 80th Street                    )
Tacoma, WA  98409;                     )
                                       )
UNITED SOUVENIR & APPAREL,             )
INCORPORATED/TRAUB COMPANY             )
2700 Sisson Street                     )
Baltimore, MD  21211;                  )
                                       )
WESTERN SOUVENIRS INCORPORATED         )
3006 West Saint Louis Street           )
Rapid City, SD  57702;                 )
                                       )
XANTERRA PARKS & RESORTS,              )
INCORPORATED                           )
6312 S. Fiddler's Green Circle,        )
Suite 600N                             )
Englewood, CO 80111;                   )
                                       )
and DOES 1 through 50,                 )
                                       )
                Defendants.            )
_____)
```

## TABLE OF CONTENTS

I.      NATURE OF THIS ACTION . . . . . . . . . . . . . . . . . .    1

II.     PARTIES . . . . . . . . . . . . . . . . . . . . . . . . .    4

III.    JURISDICTION AND VENUE . . . . . . . . . . . . . . . . .    8

IV.     INTRODUCTION AND BACKGROUND . . . . . . . . . . . . . .    8

V.      DANGERS OF LEAD EXPOSURE . . . . . . . . . . . . . . . .   10

        A.    Lead Exposure Overview . . . . . . . . . . . . . .   10
        B.    The History of Lead as a Known Toxic Substance . . .   12
        C.    Adverse Health Effects of Lead . . . . . . . . . .   14

              1.    Effects on Children . . . . . . . . . . . .   14
              2.    Effects on Pregnant Women and Fetuses . . . . .   17
              3.    Effects on Other Adults . . . . . . . . . .   17

VI.     FEDERAL REGULATION OF LEAD . . . . . . . . . . . . . .   18

        A.    The Federal Hazardous Substances Act . . . . . . .   20
        B.    The Consumer Product Safety Act . . . . . . . . .   23
        C.    The Food and Drug Administration . . . . . . . .   24

VII.    STATE REGULATION OF LEAD . . . . . . . . . . . . . . .   26

VIII.   THE ILLEGAL PRODUCTS . . . . . . . . . . . . . . . . .   27

IX.     ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . .   29

        A.    Concessioners . . . . . . . . . . . . . . . . . .   29
        B.    Manufacturers, Distributors and Vendors . . . . . .   39

              1.    Express Warranties . . . . . . . . . . . .   40
              2.    Implied Warranties . . . . . . . . . . . .   41

X.      DEFENDANTS' KNOWLEDGE . . . . . . . . . . . . . . . . .   45

        A.    The Society of Glass and Ceramic Decorators . . . . .   45
        B.    The Coalition of Safe Ceramicware, Inc. . . . . . .   47
        C.    Consent Judgments . . . . . . . . . . . . . . . .   49

XI.     DAMAGES . . . . . . . . . . . . . . . . . . . . . . . .   51

        Count I
        False Claims Act 31 U.S.C. § 3729(a)(1) and (a)(2) . . . . .   52

        Count II
        False Claims Act 31 U.S.C. § 3729(a)(7) . . . . . . . . .   53

        Count III
        False Claims Act 31 U.S.C. § 3729(a)(3) . . . . . . . . .   54

        Prayer . . . . . . . . . . . . . . . . . . . . . . . .   55

Plaintiffs Russell Brimer and Whitney Leeman, through their attorneys Hirst & Chanler LLP and Troutman Sanders LLP, on behalf of the United States of America, and based upon personal knowledge, relevant documents, and information and belief, allege as follows:

## I.    NATURE OF THIS ACTION

1.    This action alleges that Defendant concessioners, manufacturers, distributors and vendors of decorative glassware, ceramic ware and other consumer products knowingly submitted false and fraudulent claims to the United States and knowingly sold to the United States illegal, harmful and defective products containing toxic quantities of lead.  The government sustained damages by: paying for defective products it would never have purchased but for the fraud and concealment of Defendants; having Defendants sell such products bearing government emblems, insignias, logos and other markings decorated with illegal quantities of lead paint in federally-owned locations of national importance, including retail stores in Congress, the Supreme Court, the White House, federal agencies, national parks, presidential libraries, and other national landmarks; and suffering financial and other harm to its interests and reputation by placing federal employees and the public in danger as a direct consequence of Defendants' fraud.

2.    Defendants' knowing submission of false and fraudulent claims for payment constitutes a violation of the Federal False Claims Act, 31 U.S.C. § 3729 <u>et</u> <u>seq</u>. ("FCA" or "Act").  As a result of their fraudulent conduct, Defendants have caused the government to

sustain a direct loss of funds, damage to its interests, and probable injury to its citizens.

3.    The FCA was originally enacted at the request of President Lincoln during the Civil War.  The president believed that the Union Army was being defrauded, in part by unscrupulous contractors who were providing defective or useless products, including military supplies and ammunition.  The Act was substantially amended by Congress in 1986 to enhance the government's ability to recover losses sustained as a result of defendants' fraud.  At that time, Congress determined that fraud against the government was pervasive and that the FCA, which Congress described as the primary tool for combating government fraud, was in need of reform.  Congress intended that the 1986 amendments create incentives for individuals with knowledge of fraud against the United States to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecute fraud on the government's behalf.

4.    The FCA prohibits knowingly presenting, or causing to be presented, to the federal government a false or fraudulent claim for payment or approval, and conspiring to defraud the government by getting a false or fraudulent claim allowed or paid.  31 U.S.C. § 3719(a)(1), (a)(3).  Additionally, it prohibits knowingly making or using, or causing to be made or used, a false or fraudulent record or statement (a) to get a false or fraudulent claim paid or approved by the federal government or (b) to conceal, avoid, or decrease an obligation to pay or transmit money or property to the federal

government.  31 U.S.C. § 3729(a)(2), (a)(7).  Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the loss sustained by the United States. 31 U.S.C. § 3729(a)(7).

5.    The FCA defines "knowing" as having actual knowledge that the information is false, or acting with a deliberate ignorance of, or reckless disregard for, the truth or falsity of the information. 31 U.S.C. § 3729(b).

6.    The statute allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery obtained.  The Act requires that the Complaint be filed under seal for a minimum of 60 days, without service on the defendant during that time, to allow the government time to conduct its own investigation and to determine whether to join the suit.

7.    Based on the FCA, qui tam plaintiffs and relators Russell Brimer and Whitney Leeman ("Relators") seek to recover all available damages, civil penalties, and other relief for the federal violations alleged herein, in every jurisdiction to which the Defendants' fraud has extended.

8.    While all of the Defendants who engaged in the fraudulent conduct are not presently known by Relators, and the precise amount of the loss to the federal government cannot presently be determined, it is estimated that the damages and civil penalties that may be assessed against the Defendants under the facts alleged in the Complaint amount to several millions of dollars.

## II.  PARTIES

9.   Relator Whitney Leeman ("Dr. Leeman") is a resident of
Sacramento, California, with Bachelor of Science, Masters of Science,
and Ph.D. degrees in environmental engineering.  She is currently an
Air Resources Engineer in the Research Division of the California Air
Resources Board.  Dr. Leeman specializes in risk assessment and
exposure to toxic chemicals analysis, including exposure to lead from
consumer products and associated health risks.  Dr. Leeman, working
with Relator Russell Brimer, has investigated, purchased, and
analyzed the products at issue in this case.

10.  Relator Russell Brimer ("Mr. Brimer") is a resident of
Emeryville, California.  Mr. Brimer is an investigator with
substantial experience in lead testing, having performed over 5,000
field investigations of consumer products to determine their lead
content.  Working with Dr. Leeman, Mr. Brimer has investigated,
purchased and analyzed the products at issue in this case.

11.  Defendant Aramark Corporation ("Aramark") is a Delaware
corporation, with its principal office located at 1101 Market Street,
Philadelphia, Pennsylvania.  Aramark, among other businesses,
distributes consumer products and manages and operates retail stores
in national parks and other locations.  In 2005, Aramark had sales
revenue of over $10 billion.

12.  Defendant Business Innovations Worldwide, ("Business
Innovations") is a Georgia corporation with its principal office
located at 6579 Peachtree Industrial Boulevard, Norcross, Georgia.
Business Innovations manufactures and/or distributes consumer

products.   Its annual sales revenue is estimated at over $5 million.

13.   Defendant Capsco, Incorporated ("Capsco") is a corporation with its principal office located at 5107 Berwyn Road, Suite C, College Park, Maryland.   Capsco manufactures and/or distributes consumer products.   Its annual sales revenue is not presently known.

14.   Defendant Catstudio is a California company, with its principal office located at 1340 Industrial Avenue, Suite A, Petaluma, California.   Catstudio manufactures and/or distributes consumer products.   Its annual sales revenue is estimated at $1 - $2 million.

15.   Defendant Custom Souvenir & Novelty ("Custom Souvenir") is a Delaware corporation, with its principal office located at 5215 Wellington Avenue, Ventnor City, New Jersey.   Custom Souvenir manufactures and/or distributes consumer products.   In 2005, Custom Souvenir had sales revenue of over $2 million.

16.   Defendant Delaware North Companies Incorporated ("Delaware North") is a Delaware corporation, with its principal office located at 40 Fountain Plaza, Buffalo, New York.   Delaware North, among other businesses, distributes consumer products, and manages and operates retail stores in national parks and other locations.   In 2005, Delaware North had sales revenue of nearly $2 billion.

17.   Defendant Design Master Associates, Incorporated ("Design Master") is a Virginia corporation, with its principal office located at 3005 John Deere Road, Toano, Virginia.   Design Master manufactures and/or distributes consumer products.   Its annual sales revenue is estimated at $5 - $10 million.

18.  Defendant Guest Services, Incorporated ("Guest Services") is a District of Columbia corporation, with its principal office located at 3055 Prosperity Avenue, Fairfax, Virginia.  Guest Services, among other businesses, distributes consumer products and manages and operates retail stores in national parks and other locations.  In 2004, Guest Services had sales revenue of over $239 million.

19.  Defendant Jenkins Enterprises, Incorporated ("Jenkins Enterprises") is an Arkansas corporation, with its principal office located at 4949 W. Bethany Road, North Little Rock, Arkansas. Jenkins Enterprises manufactures and/or distributes consumer products.  In 2005, Jenkins Enterprises had sales revenue of nearly $7 million.

20.  Defendant Kapan-Kent Company, Incorporated ("Kapan-Kent") is a California corporation, with its principal office located at 2675 Vista Pacific Drive, Oceanside, California.  Kapan-Kent manufactures and/or distributes consumer products.  Its annual sales revenue is estimated at $2.5 - $5 million.

21.  Defendant Silberne Souvenir Sales, Incorporated ("Silberne Souvenir") is a District of Columbia corporation, with its principal office located at 2142 Queens Chapel Road, N.E., Washington, D.C. Silberne Souvenir manufactures and/or distributes consumer products. Its annual sales revenue is estimated at $10 - $20 million.

22.  Defendant Smith News Company, Inc./Smith Novelty Company ("Smith News") is a California corporation, with its principal office located at 460 Ninth Street, San Francisco, California.  Smith News

manufactures and/or distributes consumer products.  In 2004, Smith News had sales revenue of nearly $10 million.

23.  Defendant Smith-Western Company ("Smith-Western") is a Washington company, with its principal office located at 2223 S. 80th Street, Tacoma, Washington.  Smith-Western manufactures and/or distributes consumer products.  In 2004, Smith-Western had sales revenue of over $5.7 million.

24.  Defendant United Souvenir & Apparel, Incorporated/ Traub Company ("United Souvenir") is a Maryland corporation, with its principal office located at 2700 Sisson Street, Baltimore, Maryland. United Souvenir manufactures and/or distributes consumer products. In 2005, United Souvenir had sales revenue of nearly $4 million.

25.  Defendant Western Souvenirs, Incorporated ("Western Souvenirs") is a South Dakota company, with its principal office located at 3006 West Saint Louis Street, Rapid City, South Dakota. Western Souvenirs manufactures and/or distributes consumer products. Its annual sales revenue is estimated at $500,000 - $1 million.

26.  Defendant Xanterra Parks & Resorts, Incorporated ("Xanterra") is a Delaware corporation, with its principal office located at 6312 S. Fiddler's Green Circle, Suite 600N, Englewood, Colorado.  Xanterra, among other businesses, distributes consumer products and manages and operates retail stores in national parks and other locations.  In 2005, Xanterra had sales revenue of over $247 million.

27.  The identities of the remaining Doe Defendants who sold, offered for sale, or conspired to sell or offer for sale defective

and dangerous consumer products containing illegal quantities of lead
paint are presently unknown to Relators.  Both listed Defendants and
such additional Doe Defendants served as contractors, agents,
partners, and/or representatives of one and another in selling and/or
offering for sale the defective and illegal products, and were acting
within the course, scope and authority of such contract, agency,
partnership and/or representation for the conduct described herein.
Relators will amend their Complaint to identify such additional
Defendants when their identities become known.

## III. JURISDICTION AND VENUE

28.   This Court has jurisdiction over the subject matter of this
action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter
of which specifically confers jurisdiction on this Court for actions
brought pursuant to 31 U.S.C. §§ 3729 and 3730.

29.   Under 31 U.S.C. § 3730(e), there has been no public
disclosure of the "allegations or transactions" in the Complaint.
Even if there had been any such disclosure, Relators constitute
"original sources" pursuant to 31 U.S.C. § 3730(e)(4).

30.   Personal jurisdiction and venue are proper in this district
pursuant to 28 U.S.C. §§ 1391(b), 1395(a) and 31 U.S.C. § 3732(a), as
one or more of the Defendants or their agents can be found, resides,
transacts business, or otherwise engaged in fraudulent conduct within
the district.

## IV.  INTRODUCTION AND BACKGROUND

31.   From at least 1996 to the present, Defendants have sold to
the United States, or offered for sale, products that contain lead

paint in measurable amounts well beyond that allowed by law.  The
products, including glasses, mugs, shot glasses, and other glassware
and ceramic ware items contain decorative designs, emblems, insignias
and other markings.  These goods were manufactured, distributed and
sold to the government, and otherwise distributed by Defendants and
sold to the public in government-owned, government-leased or
government-operated gift shops and other federal or federally-funded
facilities.  Most of the products were designed to contain beverages
for consumption by children and adults.  Individuals who purchased
and used the products in their normal, intended and reasonably
foreseeable manner were exposed to illegal and harmful quantities of
lead.  Also exposed to illegal and harmful quantities of lead were
those who routinely handled or touched the products, including store
employees and others who packed, labeled, arranged, displayed,
stocked or otherwise came into frequent contact with the exterior
surface of the product.  Defendants knew that sale of their products
to the United States would endanger consumers and employees through
exposure to illegal quantities of lead, and knew that the United
States would not have purchased or allowed sales of the products if
the existence of such lead had been disclosed.

32.  Upon information and belief, the Defendants also knowingly
violated federal law by failing to obtain government authorization to
affix, apply or otherwise use national insignias, emblems, and logos
on their products.  Additionally, even those defendants that obtained
government approval failed to disclose to the government the illegal
use of lead in affixing, applying or using the insignias, emblems,

9

and logos.  As more fully set forth below, defendants then submitted false claims to the government for the sale of such unauthorized products.

33.  Many of the products sold by Defendants are especially dangerous because the products were intended for use by children and because high quantities of lead are present in the "lip and rim area" of glasses, mugs and other products designed to contain beverages. When children and other consumers drink from these products, the lead or lead compound is readily ingested.

**V.    DANGERS OF LEAD EXPOSURE**

    A.    <u>Lead Exposure Overview</u>

34.  Lead is a heavy metal known to be hazardous to human health.  Unlike some other metals, it has no nutritional value or health benefits.  Instead, it is a known carcinogen and a known reproductive toxin that can cause birth defects, developmental disorders in children, and harm to male and female reproductive systems.  Even tiny amounts of lead can be dangerous to human health.

35.  Lead can enter the body in a variety of ways, including through the consumption of lead contaminated food or beverages, inhalation of airborne lead contaminants, hand-to-mouth transfers (transfer of lead from a handled product to the hand that touches it, then transfer of that lead to the mouth when the person touches his or her mouth with that hand), and dermal absorption (absorption directly through the skin).

36.  Once in the body, lead passes into the blood stream and migrates to the soft tissues, such as the kidneys, liver,

reproductive organs, brain and nervous system, and mineralized tissues, such as the bones and teeth.  The body can neither use nor metabolize lead.  Accordingly, whatever lead enters the body is stored by it, mainly in the bones and teeth.  Once stored, it is only expelled very slowly, over a considerable period of time.

37.  Lead has been found to be so toxic that levels of lead exposure historically thought to be acceptable have now been shown to be dangerous.  Before the 1960s, lead exposure resulting in a blood lead level below 60 micrograms ("ug") per deciliter ("dl") of blood was considered safe.  In 1970, the United States Surgeon General officially defined this level as one of "undue lead absorption."  In 1975, the United States Center for Disease Control ("CDC") reduced this threshold level by half, to 30 ug/dl.  In 1985, the CDC reduced this level further to 25 ug/dl.  In 1986, the World Health Organization determined that 20 ug/dl should be the permissible limit.  Then, in 1989, the Science Advisory Board of the Environmental Protection Agency stated that "there is likely to be *no threshold* for lead neurotoxicity, at least within the contemporary range of blood lead levels...." (emphasis added).  Many federal agencies have for several years regarded a blood lead level above 10 ug/dl as unacceptable.  Today, there is no level of lead consumption, no matter how low, that the modern scientific community recognizes as safe.

38.  The California Superior Court recently held a major retailer liable for selling glassware decorated with lead paint without adequate warnings to consumers of the health hazards the

products posed.  The court stated:

> All experts, including those of Defendants, agree that
> lead – in any amount – serves absolutely no beneficial
> purpose for the human body.  All of the experts further
> agree that lead is a reproductive toxicant that causes
> birth defects and other reproductive harm. . . .
>
> [Plaintiff's] experts testified that there is no known
> level of human exposure to lead that is safe and free from
> risk of reproductive or other toxicity.  The Court took
> judicial notice of documents that relate to this opinion.
> The [Federal Food and Drug Administration] specifically
> states that there are "no levels of lead exposure for
> children or adults at which it may be considered that no
> adverse effect occurs."  Similarly, "safe levels of lead
> exposure have not been identified."  California's
> [Environmental Protection Agency] . . . also specifically
> cautions that, "a clear no-observed-effect concentration
> has not been established for such [lead]-related endpoints
> as birth weight, gestation period, heme synthesis, [and]
> neurobehavioral development in children and fetuses . . .

DiPirro v. J.C. Penney Co., Inc., et al., San Francisco County

Superior Court, No. 407150, Statement of Decision filed February 9,

2005, at 30-31.

     B.   The History of Lead as a Known Toxic Substance

    39.  The poisonous nature of lead has been known for centuries.

The dangers and toxicity of lead were noted as early as 2000 B.C. by

Dioscerides, when he wrote, "lead makes the mind give way."  In

ancient Rome, lead was widely used in cooking utensils, wine urns and

plumbing, probably accounting for the unprecedented epidemics of

gout, sterility among males, and infertility and stillbirths among

females.  Indeed, some scholars and historians believe that lead

exposure was a major contributing factor to the fall of the Roman

Empire.

40. In the nineteenth and twentieth centuries, lead poisoning of adults was principally occupational in origin. Factory workers were exposed to lead through inhalation, absorption, and consumption of lead contaminated food. British factory inspectors at the turn of the twentieth century noted that women exposed to lead tended to be more barren, and that children born to these women were often short-lived. In his essay "Star of the East," Charles Dickens described the pernicious effects of lead poisoning on a woman who worked in London's white lead mills, writing, "her brain is coming out her ear and it hurts dreadful."

41. In 1901, France, Belgium and Austria banned white lead interior paint. Between 1909 and 1934, at least ten European countries imposed similar bans or restrictions. In 1922, the League of Nations banned the use of white lead interior paint altogether.

42. By the 1930s, a consensus existed among scientists that lead paint posed a significant health risk to children. A December 1943 article in *Time Magazine* warned of the dangers to children from chewing on lead painted items such as toys, cribs and windowsills. In the 1950s and 1960s, cities and states across the United States enacted legislation banning the use of lead paint in homes.

43. In January 1997, a report to Congress by the United States Department of Health and Human Services ("HHS") catalogued the literally thousands of scientific studies over many years documenting the adverse effects of lead exposure on the health of children and adults ("Report"). The studies cited included those by federal agencies HHS, CDC, HHS' Agency for Toxic Substances and Disease

Registry ("ATSDR"), and the National Institute for Occupational
Safety and Health ("NIOSH").  The Report and cited studies
demonstrated that, without question, lead is toxic and harmful to
humans.

     C.   <u>Adverse Health Effects of Lead</u>

    44.  Lead exposure has been scientifically determined to have
adverse health effects on fetuses, children, pregnant women, and
other adults.  According to HHS' Report, lead affects all organs and
functions of the body to varying degrees and the effect of lead
toxicity on the central nervous system is likely irreversible.
Toxic effects can be noted regardless of the "exposure pathway" (the
mechanism through which lead enters the body, i.e., ingestion,
inhalation, or dermal exposure through handling of the product).  In
addition to demonstrated harm to all adults, studies have shown that
children and pregnant women are at greatest risk.

     1.   <u>Effects on Children</u>

    45.  Even very low levels of lead exposure can be dangerous to
children.  The ATSDR has stated: "[i]t must be emphasized ... that,
for children, there may be no threshold for developmental effects.
... It is important to interdict all lead exposures." (ATSDR, "Lead
Toxicity Physiologic Effects" (6/20/05)).

    46.  Children are more sensitive to lead exposure than adults in
large part because their brain and nervous system are still
developing.  Specifically, the incomplete development of the blood-
brain barrier in young children increases the risk of lead's entry

into the developing nervous system, which can result in prolonged or permanent neurobehavioral disorders.

47.  Lead poisoning is often an asymptomatic disease in children, which means that even children who appear healthy can have dangerous levels of lead in their bodies.  As a consequence, many children suffering from lead poisoning do not have their disease diagnosed until their symptoms become severe.

48.  Children with high blood lead levels may suffer from a variety of neurological disorders, including: progressive loss of memory and cognitive ability, personality changes, inability to concentrate, lethargy, muscle atrophy and weakness, tremors, myoclonus (involuntary muscular twitching), nystagmus (rapid, involuntary eye movement), dementia, seizures, loss of ability to swallow or speak, and progressive loss of consciousness.  In severe cases, children with high levels of lead may suffer permanent neurological damage that can result in severe retardation, recurrent convulsions, and death.

49.  Recent studies have shown that even low levels of childhood lead exposure cause or contribute to: anemia; slowed growth; impaired speech and hearing; learning disabilities; decreased intelligence; diminishment of balance, visual skills, fine motor skills, verbal skills, attention, concentration, and impulse control; early signs of attention deficit hyperactivity disorder or "ADHD"; and increased criminal behavior.  One study that followed children into adulthood found a sevenfold increase in the risk of a child developing a

reading disability, when he or she was exposed to sufficient levels of lead as a toddler.

50.   Studies further show that the risk of lead exposure is disproportionately high for certain groups of children, including children of poor families, of Hispanic heritage, residing in large metropolitan areas or living in older housing.  An April 2003 study reported in the *New England Journal of Medicine* examined blood lead levels of girls ages 8 to 18 and found that low-level lead exposure was associated with a delay in the onset of puberty for Hispanic and African-American girls.

51.   In a 1991 report on preventing lead poisoning in young children, the CDC stated:

> Childhood lead poisoning is one of the most common pediatric health problems in the United States today, and it is entirely preventable. Enough is now known about the sources and pathways of lead exposure and about ways of preventing this exposure to begin the efforts to eradicate permanently this disease.  The persistence of lead poisoning in the United States, in light of all that is known, presents a singular and direct challenge to public health authorities, clinicians, regulatory agencies, and society.

> LEAD POISONING IS ONE OF THE MOST COMMON AND PREVENTABLE PEDIATRIC HEALTH PROBLEMS TODAY.

> Lead is ubiquitous in the human environment as a result of industrialization.  It has no known physiologic value. Children are particularly susceptible to lead's toxic effects.  Lead poisoning, for the most part, is silent: most poisoned children have no symptoms.  The vast majority of cases, therefore, go undiagnosed and untreated.  Lead poisoning is widespread.  No socioeconomic group, geographic area, or racial or ethnic population is spared.  (Emphasis in  original).

52.   In 1992, Congress adopted official findings on lead exposure in children.  The United States Code provides: "The Congress

finds that: (1) low-level lead poisoning is widespread among American children, afflicting as many as 3,000,000 children under age 6 [and] (2) at low levels, lead poisoning in children causes intelligence quotient deficiencies, reading and learning disabilities, impaired hearing, reduced attention span, hyperactivity, and behavior problems...." 42 U.S.C. § 4851.

2.    Effects on Pregnant Women and Fetuses

53.    Both the mother and fetus face increased dangers from a pregnant woman's exposure to lead.  HHS' Report to Congress identified a special concern for pregnant women since analysis has shown that lead accumulation in the bones is released into the blood during pregnancy.  Historical studies show that high lead exposures produce stillbirths and miscarriages, while several studies in the United States and abroad document exposures to even low lead levels can result in adverse pregnancy outcomes, including shortened gestation, decreased fetal mental development, and decreased fetal growth.  Even after birth, a newborn can be exposed to lead through ingestion of lead-contaminated mother's milk.  Studies show that the amount of lead released from a mother's bones is greatest during the third trimester of pregnancy and lactation.

3.    Effects on Other Adults

54.    Childhood neurological effects from exposure can persist into adulthood.  Studies cited by ATSDR correlate lead exposure with lower classroom performance, greater absenteeism, more reading disabilities, and deficits in vocabulary, fine motor skills, reaction time, and hand-eye coordination in young adults more than 10 years

17

after childhood exposure (American Academy of Pediatrics 1993, Needleman, et al. 1990). A 1991 study found a higher proportion of learning disabilities among school-aged children with biological parents who were lead poisoned as children *fifty years previously*, suggesting even subsequent offspring of exposed children may be at greater risk for neurologic development impairment. The ATSDR concluded that "there is a wide range of neurologic effects associated with lead exposure, some of which may likely be irreversible." ATSDR, Neurologic Effects (6/20/05).

55. But even without childhood exposure, many of the same adverse effects will be experienced by lead-exposed adults, though the toxicity thresholds tend to be higher. Studies on lead-exposed adults have demonstrated diminished: IQ scores, reaction time, visual motor performance, hand dexterity, and cognitive performance (ATSDR 1999). Additional evidence shows lead exposure's effects on adults' postural balance and peripheral nerve function (ATSDR 1997), and lead has been demonstrated to cause parathesia, weakness, dizziness, impotence, malaise, forgetfulness, impaired concentration, depression and mood changes (ATSDR 6/20/05).

## VI. FEDERAL REGULATION OF LEAD

56. According to an ATSDR study in 1999 and an American Academy of Pediatrics study in 1993, *lead paint* is a primary source of environmental exposure, and *the major source of lead exposure for children*. As such, according to the Centers for Disease Control and Prevention, "great effort has been undertaken in the United States over the past two decades to remove lead from ... paints."

57.   The current scientific evidence suggests that no amount of lead is safely ingested, especially by pregnant women and children. The ATSDR states on its website: "It must be emphasized ... that, for children, there may be no threshold for developmental effects....It is important to interdict all lead exposures."
(http://www.atsdr/cdc.gov/HEC/CSEM/lead/physiologic-effects.html).

58.   The Consumer Product Safety Commission (CPSC), the CDC, the Environmental Protection Agency (EPA), the Department of Housing and Urban Development (HUD), and other federal agencies have stated that blood lead levels above 10 ug/dl are a health concern and recommend community-wide preventive measures (see CDC, 1991; and CPSC, 1992; CPSC, 1996).  Sustained blood lead levels of 10 ug/dl or greater have been associated with a variety of adverse health effects, discussed above, including deficits in neurobehavioral function and intellectual performance, developmental delays, decreased stature, and diminished hearing acuity.  To prevent young children from exceeding the 10 ug/dl blood lead level, the CPSC suggests that chronic ingestion (about 15-30 days considered surrogate for chronic ingestion) of lead from paint and other consumer products not exceed 15 ug lead/day (CPSC, 1990).  The limit of 15 ug lead/day is based on human chronic exposure models relating ingested lead to blood lead levels (CPSC, 1989, 1990, 1992).  Included in the 15 ug/day limit is consideration of several parameters such as amount of lead ingested, lead absorption, weight of lead paint, and other "background" sources of lead.

59.  The Federal Hazardous Substances Act (FHSA), 15 U.S.C. §§ 1261 et seq., makes it illegal to ship, buy or sell any misbranded or banned hazardous substance.  15 U.S.C. § 1263.  Similarly, the Consumer Product Safety Act (CPSA), 15 U.S.C. §§ 2051 et seq., makes it illegal to manufacture or sell a product that either violates a consumer product safety standard or has been declared a banned hazardous product.  15 U.S.C. § 2068(a)(1),(2).  Both of those statutes outlaw the Defendants' sales of the products in this case, as shown below.

A.  The Federal Hazardous Substances Act

60.  The FHSA defines a hazardous substance as "any substance or mixture of substances which is toxic."  15 U.S.C. § 1261(f)(1)(A)(I).  The term "toxic" applies to "any substance (other than a radioactive substance) which has the capacity to produce personal injury or illness to man through ingestion, inhalation, or absorption through any body surface."  15 U.S.C. § 1261(g).  A hazardous substance "intended, or packaged in a form suitable for use in the household or by children [must] bear a label which states conspicuously ... the signal word "WARNING" or "CAUTION" on all ... hazardous substances."  15 U.S.C. § 1261(p)(1)(D).  A product that fails to contain such a warning is a "misbranded hazardous substance."  Id.

61.  In the Code of Federal Regulations, the CPSC states: "Under the Federal Hazardous Substances Act (FHSA), 15 U.S.C. §  1261(f)(1), household products that expose children to hazardous quantities of lead under reasonably foreseeable conditions of handling or use are 'hazardous substances.'  A household product that is not intended for

children but which creates such a risk of injury because it contains
lead requires precautionary labeling under the Act.  15 U.S.C. §
1261(p).  A toy or other article intended for use by children which
contains a hazardous amount of lead that is accessible for children
to ingest is a banned hazardous substance.  15 U.S.C. §
1261(q)(1)(B).  In evaluating the potential hazard associated with
products that contain lead, the CPSC considers these major factors on
a case-by-case basis: the total amount of lead contained in a
product, the bioavailability of the lead, the accessibility of the
lead to children, the age and foreseeable behavior of the children
exposed to the product, the foreseeable duration of the exposure, and
the marketing, patterns of use, and life cycle of the product."  16
C.F.R. § 1500.230(c)(1).

        62.  In several instances, the CPSC has acted to recall products
containing lead.  It determined that: "had the manufacturers of these
lead-containing products acted with prudence and foresight before
introducing the products into commerce, they would not have used lead
at all.  This in turn would have eliminated both the risk to young
children and the costs and other consequences associated with
corrective action."  16 C.F.R. § 1500.230(c)(3).  The CPSC concluded:
"The Commission urges manufacturers to eliminate lead in consumer
products to avoid similar occurrences in the future."  16 C.F.R.
§ 1500.230(c)(4).  In its "Guidance for Lead (Pb) in Consumer
Products," the CPSC states: "To reduce the risk of hazardous exposure
to lead, the Commission requests manufacturers to eliminate the use
of lead that may be accessible to children from products used in and

around households...."  (http://www.cpsc.gov/BUSINFO/leadguid.html).

63.  Apart from manufacturers of products that contain lead, the FHSA imposes requirements on the importers, distributors and retailers of such products.  The statute, under "Prohibited Acts," provides that "the following acts and the causing thereof are prohibited: The introduction or delivery for introduction into interstate commerce of any misbranded hazardous substance or banned hazardous substance[;]" and "The receipt in interstate commerce of any misbranded hazardous substance or banned hazardous substance and the delivery or proffered delivery thereof for pay or otherwise."  15 U.S.C. § 1263(a),(c).  The Act provides for criminal penalties and imprisonment for violation of the section (with certain good faith exceptions).  15 U.S.C. § 1264(a).  Also, as to a manufacturer, importer, private labeler or a distributor (not a retailer unless the retailer had actual knowledge of the misbranded hazardous substance), violation of the section gives rise to civil penalties of $5,000 for each violation with a maximum civil penalty not to exceed $1,250,000 for any related series of violations.  15 U.S.C. § 1264(c).

64.  Accordingly, in 16 C.F.R. § 1500.230, the CPSC states that "under the FHSA, any firm that purchases a product for resale is responsible for determining whether that product contains lead and, if so, whether it is a 'hazardous substance.'  The Commission, therefore, recommends that, prior to the acquisition or distribution of such products, importers, distributors and retailers obtain information and data, such as analyses of chemical composition or accessibility, relevant to the determination from manufacturers, or

have such evaluations conducted themselves." 16 C.F.R. §
1500.230(c)(5).

   B.   The Consumer Product Safety Act

   65.   Under the CPSA, if the CPSC finds that a product presents a
substantial hazard, it can order manufacturers, distributors and
retailers of the product to eliminate or rectify the hazard, and to
compensate consumers who have purchased the product. 15 U.S.C.
§ 2064.

   66.   The CPSA also authorizes the CPSC to promulgate consumer
product safety standards through regulations, 15 U.S.C. § 2056, and
to declare, by regulation, a banned hazardous product if the CPSC
finds that a consumer product presents an unreasonable risk of
injury, is distributed in commerce, and the safety standard is
unsatisfactory to protect the public. 15 U.S.C. § 2057. Defendants
who violate the CPSA are subject to criminal and civil penalties,
including imprisonment for up to one year, a criminal fine of up to
$50,000, and a civil fine up to $1.25 million for a series of
violations.

   67.   In 1977, the CPSC, through regulation, banned paint and
other surface-coating materials for consumer use containing more than
0.06% of lead by weight. It also banned toys, other articles
intended for use by children, and furniture bearing paint containing
in excess of 0.06% lead by weight. 16 C.F.R. § 1303. The CPSC
issued the ban because it found "an unreasonable risk of lead
poisoning in children associated with lead content of over 0.06

percent in paint and coatings to which children have access." 16
C.F.R. § 1303.1(c).

68.  The CPSC has observed that "young children are most
commonly exposed to lead in consumer products from the direct
mouthing of objects, or handling such objects and subsequent hand-to-
mouth activity." 16 C.F.R. § 1500.230(b).

C.  The Food and Drug Administration

69.  The Food and Drug Administration ("FDA") has established
maximum levels for leachable lead in ceramic ware, and pieces that
exceed those levels are subject to recall or other agency enforcement
action.  The levels are based on how frequently an item of ceramic
ware is used, the type and temperature of the food it contains, and
how long the food stays in contact with the item.  Cups, mugs and
pitchers have the most stringent action level, 0.5 parts per million,
because they can be expected to hold food longer, allowing more time
for lead to leach.  For example, a coffee mug may be used daily to
hold a hot acidic beverage, often several times a day.  The FDA
allows a maximum of 3 parts per million for plates, saucers and other
flatware.  (http://www.fda.gov/fdac/features/1998/198_lead.html).

70.  Since 1994, the FDA has required high lead-leaching
decorative ceramic ware to be permanently labeled that it is not for
food related use and may poison food.  21 C.F.R. § 109.16(b)(1)(I).
The FDA has also banned tin-coated foil capsules on wine bottles,
after a study by the United States Bureau of Alcohol, Tobacco and
Firearms found that some of the inspected wines had become

24

contaminated with lead during pouring, due to lead being deposited at the mouth of the bottle.  21 C.F.R. § 189.301.

71.  Similarly, the FDA has addressed the problem of lead in food packaging.  According to FDA, "the use of a lead-based printing ink on a food package causes the product to be in violation of the Federal Food, Drug, and Cosmetic Act (many States also have laws that are similar) if lead from the ink contaminates or can be reasonably expected to contaminate the food, either while it is held in the package or during the act of eating."  FDA, Center for Food Safety and Applied Nutrition, June 13, 1995 Guidance for Industry (Lead in Candy).  In such cases, if the product is subject to regulatory action by FDA, the agency may prohibit its entry into the country if offered for import or, if found within domestic commerce, may remove it from the market.  In issuing the 1995 Guidance, the FDA cited the Federal Commerce Commission (FCC) compendium published by the Food and Nutrition Board of the Institute of Medicine, National Academy of Sciences, which listed a 0.5 parts per million (ppm) maximum for lead in sucrose (sugar).  Since that Guidance, in response to the growing awareness of lead's adverse effects at even low levels , the FCC has lowered its specification for lead in sucrose to 0.1 ppm.  Accordingly, the FDA has now issued a revised draft Guidance to adopt that 0.1 ppm standard.  As the agency states: "FDA is recommending that lead levels ... not exceed 0.1 ppm because such levels are achievable under good manufacturing practices and would not pose a significant risk to small children for adverse effects."  FDA, Center

for Food Safety and Applied Nutrition, December 2005 Guidance for Industry (Draft Guidance).

## VII.  STATE REGULATION OF LEAD

72.  Numerous state statutes proscribe the use of lead-based paint on consumer products.  For example, the District of Columbia Official Code provides that "a business entity or individual shall not sell, offer for sale, deliver, transfer, or possess with intent to sell, deliver, or transfer any ... household appliance, cooking, drinking or eating utensil ... or other article intended for use by children to which a lead-based paint or glaze has been applied." D.C. Code § 8-115.03(c)

73.  In California, Proposition 65 makes it illegal to sell products containing chemicals known to cause cancer or reproductive problems without providing a warning of the health hazard to consumers.  In 1987, lead was placed on the Governor's first list of chemicals known to the State to cause reproductive toxicity and requiring such a warning.  The statute provides:  "No person in the course of doing business shall knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving clear and reasonable warning to such individual."  Violators are subject to a civil penalty of up to $2,500 per violation per day.  Cal. Health and Safety Code § 25249.7(a),(d).

74.  In New York, the Commissioner of Health is charged with enforcing standards for lead in products.  The New York Health Law provides that, "in the absence of a federal standard for a specific

type of product, the commissioner shall establish the maximum quantity of lead or cadmium (and the manner of testing therefore) which may be released from glazed ceramic tableware, crystal, china and other consumer products.  Such maximum quantity shall be based on the best available scientific data and shall insure the safety of the public by reducing its exposure to lead and cadmium to the lowest practicable level ...."  NY Pub. Health Law § 1376-a.

75.  In its statute addressing "Sale of objects containing lead bearing substances," Illinois law provides that "no person shall sell or transfer or offer for sale or transfer any ... objects intended to be used ... or located in ... a residential building ... that contains a lead bearing substance and that, in the ordinary course of use, are accessible to and chewable by children."  410 Ill. Comp. Statutes § 45/5.

76.  Similarly, Massachusetts law states that "no person shall sell, expose for sale, deliver, give away or possess with intent to sell, deliver or give away any toy, furniture, cooking, drinking or eating utensil to which any lead-based paint, glaze or other substance has been applied."  Mass. Gen. Law Ann. § 196(a).

**VIII.  THE ILLEGAL PRODUCTS**

77.  Relators incorporate by reference as though fully alleged herein all of the factual information set forth in Exhibit A to the Complaint.

78.  Exhibit A identifies numerous, representative products manufactured, distributed, sold or allowed to be sold by Defendants that contain illegal quantities of lead in violation of federal and

state statutes, regulations and Defendants' contractual obligations.
For each product, the Relators set forth: (a) the product's name; (b)
digital photos of the product from various angles; (c) a description
of the product decoration on the exterior and interior surfaces; (d)
a description of the substrate, including material and color; (e) a
listing and measurement of any decoration in the "lip and rim area";
(f) the product dimensions; (g) the model or item number; (h)
manufacture information, if available, including the country of
origin; (i) the retail store and its address at the governmental
facility where the Relators purchased the product; (j) the date of
purchase; (k) the price per unit of the product; (l) the quantity of
units of each product purchased; and (m) a unique evidence number
code assigned by the Relators to each unit of each product purchased.
Additionally, for each product, the Relators include a sales receipt
depicting the date, time, location, price and quantities of purchase.

79. After examining and purchasing over 585 suspicious
products, the Relators performed preliminary swab testing to
determine whether lead was present. They then eliminated products
that did not test sufficiently high for lead content. Ultimately,
over 175 products were sent to an independent lab for analysis. The
lab utilized federally accepted testing methods to determine the
extent of leachable lead. For every product, a series of tests was
conducted by the lab, including (a) a digestion test, setting forth
the lead measured in milligrams per kilogram (or parts per million),
(b) a surface wipe test, setting forth the lead measured in
micrograms per sample, and/or (c) an extraction test, setting forth

the lead measured in micrograms per milliliter.  For all products
identified in Exhibit A, both the preliminary test performed by
Relators and the lab test revealed dangerous amounts of lead.  An
example of the lab testing ordered and performed for each product in
Exhibit A is set forth for one such product in Exhibit B.

## IX.  ALLEGATIONS

### A.  Concessioners

80.  Relators incorporate by reference and reallege as though
fully set forth herein paragraphs 1 - 79.

81.  Defendant concessioners, such as Guest Services, Aramark,
Delaware North, and Xanterra (hereafter collectively "Concessioners")
manage and operate retail stores on federal property.  Among other
properties, Guest Services operates all retail stores and kiosks on
the National Mall, in Washington, D.C.; the National Aquarium's
retail stores; the National Park Service, Mount Rainier Park's gift
shops; the U.S. Census Bureau Sunny Spots; the U.S. Department of the
Interior's Indian Craft Shop; and the U.S. House of Representatives
Convenience Shop.  As Guest Services proclaims, it "provides all
retail management for the congressional convenience shops serving
Members of Congress, their staff, Administration officials and
tourists."  (http://www.guestservices.com/content.asp?contentid=408).
Similarly, Delaware North, through its subsidiary Delaware North
Companies Parks & Resorts, manages and operates retail facilities on
behalf of the United States in numerous locations, including the
Yosemite, Yellowstone, Grand Canyon, and Sequoia national parks, the
Tenaya Lodge, the Kennedy Space Center Visitor Complex, the Oregon

Caves National Monument, and the U.S. Mint in Philadelphia and Denver.  Among other locations, Aramark operates retail stores in the Denali, Mesa Verde, and Shenandoah national parks, as well as facilities in Muir Woods, Pikes Peak and Ellis Island.  On its website, Xanterra describes itself as the "country's largest park and resort management company."  (http://www.xanterra.com).  It operates retail stores in, among other national parks, Mt. Rushmore, Yellowstone, Bryce Canyon and the Petrified Forest National Park.

82.  Concessioners enter into "Concessioner Contracts" with federal agencies.  For example, in March 1986, Guest Services and the United States Department of the Interior, National Park Service ("NPS") executed Contract No. CC300060002 ("the Contract"), authorizing Guest Services to manage retail stores in the National Capital Region through December 31, 2010.  For obtaining the rights to operate stores on federal land, Concessioners typically pay an annual franchise fee to the government and also pay a portion of the Concessioners' gross revenues earned under operation of the contract. See Contract, §§ 9(a)(1),(2).

83.  In 1998, after analyzing concessioners' practices in national parks, Congress enacted the National Parks Omnibus Management Act of 1998, 16 U.S.C. §§ 5901 et seq. ("1998 Act").  In repealing a prior 1965 statute governing concessioner contracts, the 1998 Act reformed the oversight of, and responsibilities undertaken by, Concessioners on federal property.  In the new legislation, Congress clarified that its primary concern in contracting with Concessioners was not to raise revenue, but rather to ensure that

park resources were protected and that the public was well-served. As the Act states, "consideration of revenue to the United States will be subordinate to the objectives of protecting, conserving, and preserving resources ... and of providing necessary and appropriate visitor services to the public at reasonable rates." 16 U.S.C. § 5952(5)(a)(iv); see also 36 C.F.R. § 51.17(a)(5); 65 Fed. Reg. 20672 (April 17, 2000), § 51.17(a)(5). Congress repeated its objectives in its statement of policy: "It is the policy of the Congress that ... services ... shall be limited to those ... necessary and appropriate for public use." 16 U.S.C. § 5951(b)(1).

84. Under the 1965 statute, a Concessioner's prior contract with NPS gave rise to a "preference" for that Concessioner to obtain a subsequent contract for services at the same national park. Accordingly, "[b]ecause of this preference, NPS estimated in 1993 that since 1965 over 99.9% of renewals of NPS concession contracts had been awarded to the existing concessioner." 65 Fed. Reg. 20630 (April 2000). The 1998 Act provides that, to obtain a preference above other bidders for a renewal of an existing contract, concessioners will now be judged on their past performance. Accordingly, each concessioner must undergo an "annual evaluation" by NPS to determine whether it has performed satisfactory work under the contract. 36 C.F.R. § 51.44; 65 Fed. Reg. 20675 (April 17, 2000), § 51.44. As NPS noted, "a right of preference, which amounts to a statutory right to have greater rights to the award of a government contract than the general public, must be earned through satisfactory performance." 65 Fed. Reg. 20646 (April 17, 2000).

85.   In annual evaluations, NPS now considers the "concessioner's performance under the terms of the applicable concession contract and other relevant facts and circumstances." 36 C.F.R. § 51.44; 65 Fed. Reg. 20675 (April 17, 2000).  Indeed, the 1998 Act provides that a decision by NPS to award a new contract must be based on specific criteria.  Among the most heavily weighted of the criteria are the contractor's "providing necessary and appropriate visitor services at reasonable rates," 36 C.F.R. § 51.17(a)(2), which includes the "merchandising" offered by the Concessioner.  65 Fed. Reg. 20670 (April 17, 2000).

86.   According to NPS, an offeror bidding for a contract, including an existing concessioner, "should be rated on its commitment to further the goals of the park area and to operate in a manner that is supportive of the ideals of the park.  NPS considers that these interests are implicit in the established selection criteria." 65 Fed. Reg. 20640 (April 17, 2000).

87.  Even after selection of a Concessioner, the 1998 Act establishes that an awarded contract can be suspended or terminated by NPS "when necessary to achieve the purposes of the 1998 Act ... [including] ... providing necessary and appropriate visitor services in park areas." 36 C.F.R. § 51.74; 65 Fed. Reg. 20680 (April 17, 2000).

88.  In response to the 1998 Act, NPS promulgated a new model concessioner contract.  Before doing so, NPS offered a period of notice and comment by the public.  65 Fed. Reg. 26052 (May 4, 2000). Fifteen public comments were received in response to the proposed

model contract, all but one from existing concessioners or their
counsel.  The comments were mostly negative, some going so far as to
suggest that "no one will submit proposals under the terms of the new
concession contract."  65 Fed. Reg. 26052 (May 4, 2000).  NPS utterly
rejected that view, because contracts allowing operations at national
parks and other federal landmarks provide substantial profits for the
concessioners.  After noting that the new concessioner contract was
appropriate in light of the 1998 Act and proper administration of the
concession program, NPS stated: "NPS also believes that it will have
no difficulty attracting qualified businesses to submit proposals for
new concession contracts.  NPS concession businesses are profitable
and enjoyable."  Id.

90.  Several commenters objected to the special provisions
contained in the new concessioner contract that NPS determined were
necessary to "give NPS the ability to properly preserve and protect
... the national park system and their visitors."  NPS concluded:
"These [special provisions] include the ability to describe and
modify the nature of concessioners' operations ... and the ability to
terminate the contract when necessary for resource and visitor
protection.  NPS appreciates that these types of authorities are not
typical in commercial leasing or contracting arrangements.  However,
they are essential to achieving the NPS mission of protecting and
preserving park areas and their visitors."  65 Fed. Reg. 26052 (May
4, 2000).

90.  After reviewing and analyzing the public comments, NPS
published a new model concessioner contract to "conform to the

33

requirements of the 1998 Act." 65 Fed. Reg. 26052 (May 4, 2000).
Despite "new" contract provisions arising from the 1998 Act
requirements, Congress stated that "the provisions of [the 1998 Act]
shall apply to any [existing] contract or permit except to the extent
such provisions are inconsistent with the terms and conditions of any
such contract or permit." 16 U.S.C. § 20 note; Pub L. 105-391, Title
IV § 415(a), 112 Stat 3515 (1998).

    91.   Among other requirements, the new model contract provides
that:

    (a) the Concessioner "must comply with all Applicable Laws in
fulfilling its obligations under this CONTRACT," including "federal,
state and local laws, rules, regulations, requirements and policies
governing ... protection of the environment and protection of public
health and safety." 65 Fed. Reg. 26065 (May 4, 2000), § 5(a); 65
Fed. Reg. 26063 (May 4, 2000), § 2(a); and

    (b) the Concessioner must comply with "Environmental Management
Objectives" in the conduct of its operations under the concessioner
contract (65 Fed. Reg. 26065 (May 4, 2000), § 6(a)), which are:

    (1) "The Concessioner, including its employees, agents and
contractors, shall comply with all Applicable Laws pertaining to the
protection of human health and the environment." 65 Fed. Reg. 26065
(May 4, 2000), § 6(a)(1); and

    (2) "The Concessioner shall incorporate Best Management
Practices (BMPs) in its operation ... acquisition, provision of
visitor services, and other activities under this CONTRACT." Best
Management Practices "are policies and practices that apply the most

current and advanced means and technologies available to the Concessioner to undertake and maintain a superior level of environmental performance reasonable in light of the circumstances of the operations conducted under this CONTRACT." 65 Fed. Reg. 26065 (May 4, 2000), § 6(a)(2); 65 Fed. Reg. 26063 (May 4, 2000), § 2(c).

92. Significantly, to further implement the Congressional goals in the 1998 Act of providing a safe and secure environment for the public, the model contract also provides that:

(a) the Concessioner "shall develop, document, implement, and comply fully with" a comprehensive written Environmental Management Program (EMP), updated and submitted annually by the Concessioner, to achieve the Environmental Management Objectives. 65 Fed. Reg. 26065 (May 4, 2000), § 6(b)(1). The EMP "shall account for all activities with potential environmental impacts conducted by the Concessioner or to which the Concessioner contributes." 65 Fed. Reg. 26065 (May 4, 2000), § 6(b)(1),(2);

(b) the EMP "shall describe how the Concessioner will comply with the EMP and how the Concessioner will self-assess its performance under the EMP, at least annually." The self-assessment "should ensure the Concessioner's performance with the Environmental Management Objectives," "measure performance against environmental goals and targets," and "also describe procedures to be taken by the Concessioner to correct any deficiencies identified by the self-assessment." 65 Fed. Reg. 26066 (May 4, 2000), § 6(b)(3)(ix); and

(c) in addition to the Concessioner's self-assessment, the Concessioner "shall be evaluated by the Director on its environmental

35

performance under this CONTRACT, including, without limitation, compliance with the approved EMP, on at least an annual basis." 65 Fed. Reg. 26066 (May 4, 2000), § 6(c).

93. Finally, the contract provides that: "The Concessioner shall give the Director immediate notice of any violation of Applicable Laws by the Concessioner, including its employees, agents or contractors, and, at its sole cost and expense, must promptly rectify any such violation." 65 Fed. Reg. 26065 (May 4, 2000), § 5(b).

94. The Guest Services 1986 Contract identified above has terms consistent with the model requirements. For example, it requires the Concessioner throughout the term of the Contract to provide services for the public, including merchandise, souvenirs and other retail sales at the designated area covered by the Contract. Contract, § 2(a). It also states that the Concessioner's operation under the Contract "shall be subject to the laws of Congress governing the area, and the rules, regulations and policies promulgated thereunder, whether now in force or hereafter enacted or promulgated...." Contract, § 2(b). Finally, the Contract provides that NPS may terminate the contract in whole or in part when necessary for the protection of visitors, and may similarly suspend operations of the Concessioner, at NPS' discretion, when necessary to protect the health and safety of visitors and employees. Contract, § 11(a). When NPS deems it necessary to suspend operations of the concessioner to protect visitors, NPS "shall not be liable for any compensation to the Concessioner for losses occasioned thereby." Contract, § 11(b).

95.  In selling defective products with dangerous and illegal quantities of lead, Concessioners knowingly violated federal law, regulatory requirements, and contractual obligations, as set forth above, in including, but not limited to, the following:

a)   Concessioners and their employees, agents and contractors failed to comply with federal Applicable Laws pertaining to the protection of human health and the environment, including the Federal Hazardous Substances Act;

b)   Concessioners failed to comply fully with EMP requirements, including failing to perform annual self-assessment of their environmental practices, which would have disclosed their employees', agents', and contractors' illegal sale of defective and dangerous products;

c)   Concessioners failed to incorporate BMP in its testing and purchases of products, which would have disclosed the dangerous and illegal quantities of lead before resale of the products to park visitors; and

d)   Upon realization of their sale of dangerous and illegal products to the public, Concessioners failed to give immediate notice to NPS of their conduct, instead taking measures to disguise such prior sales.

96.  As a result of Concessioners' knowingly false express and implied certifications and representations to NPS of compliance with statutory, regulatory and contractual requirements in annual reports and assessments, as well as such false certifications and representations in bids for renewals and subsequent contracts, NPS

37

did not take action to terminate or suspend operations of
Concessioners' retail sales of defective products.  Concessioners
fraudulent conduct, from at least 1996 to the present, and its
failure to disclose such conduct to NPS, allowed Concessioners to:

(a) submit and win bids for contracts which they otherwise would
not have been awarded;

(b) continue to make, at high profit, illegal and dangerous
sales of defective products to the unsuspecting public; and

(c) pay smaller annual franchise fees to NPS than they otherwise
would have been required to pay.

97.  Many of the products offered for sale by Concessioners at
national parks and other government locations contain United States'
emblems or other national insignias, such as agency logos, seals, and
other identifying markings.  Upon information and belief,
Concessioners knowingly purchased and re-sold to the public products,
including those manufactured overseas, in which the manufacturers or
vendors of the products failed to obtain appropriate agency
authorization for use of such emblems, insignias and logos.

98.  The government requires vendors wishing to sell products
bearing official government seals and logos to follow federal law to
obtain permission for such use.  Each agency has promulgated
regulations specifying how such permission may be obtained, and the
United States Code provides for criminal sanctions (fines and
imprisonment for not more than six months) for use of official
insignias other than through agency authorization.  18 U.S.C. § 701.
For example, the National Archives and Records Administration (NARA)

requires a written request for use of the agency's seal.  NARA must specifically approve how the seal or logo will be displayed, including requiring the applicant to submit "a sample" of the "material on which the seal(s) or logo(s) would appear."  36 C.F.R. § 1200.8(a)(2).  Under "criteria for approval," the regulations specify that seals or logos will not be used on any article or in any manner that reflects unfavorably on NARA."  36 C.F.R. § 1200.10(b).

99.  Upon information and belief, by failing to obtain agency approval for the sale of their defective products bearing the agencies' seals or logos, Defendants deprived the agencies of the opportunity to inspect and examine the products and determine their fitness for sale.  By otherwise selling the products to the government, and by offering the products for sale to the public in government facilities, Defendants knowingly and falsely certified, expressly or impliedly, that the products had undergone such official agency inspection, examination and approval.

B.    <u>Manufacturers, Distributors and Vendors</u>

100.  Relators incorporate by reference and reallege as though fully set forth herein paragraphs 1 - 79.

101.  Numerous Defendants identified herein sold dangerous and defective products containing lead to the United States, either directly as a manufacturer or vendor, or through other Defendants acting as distributors or middlemen (hereafter, for this Section IX(B) only, this total subset of Defendants are collectively referred to as "the direct-sale Defendants").  In addition to violation of the provisions contained in their contracts, purchase orders and invoices

that apply to such sales, various other express and implied

warranties were knowingly violated by the direct-sale Defendants.  In

doing so, as well as in their other conduct, these Defendants

violated the False Claims Act.

     1.    Express Warranties

     102.    Vendors generally sell products to the United States

through contracts, purchase orders or invoices.  Upon information and

belief, the provisions set forth in the Smithsonian Institution's

Terms and Conditions, concerning products obtained for sale in its

museums stores through purchase orders with vendors, are typical of

the requirements imposed upon such vendors.  Among other

specifications, those terms and conditions provide:

     (a)    "GUARANTEE OF COMPLIANCE WITH LAW - Vendor ... guarantees

that no applicable Federal, State or Local law prohibits the

shipment, offering for sale, sale, or use for the purpose intended of

merchandise covered by this order."

     (b)    "BREACH OF WARRANTY OR GUARANTEE - in the event any

merchandise covered in this purchase order, in whole or in part,

including packaging, labels or labeling, is determined by Museum

stores in its good faith discretion to be of inferior quality or

workmanship, or not in conformity with the terms, specifications or

requirements of this order, vendor shall at the written request of

Museum stores give Museum stores full credit for any merchandise

returned (or if requested, cash for such items of merchandise) plus

transportation charges back to the vendor.  Neither payment of

invoices nor delayed return of merchandise shall constitute

acceptance of merchandise to be deemed a waiver of Museum stores rights to return merchandise."

(c)   "PRODUCT LIABILITY: The vendor agrees to defend, save and hold harmless the Smithsonian Institution from all damages and injuries which arise or allege to arise out of the manufacture, distribution, and sale of the Vendor's products."

(d)   "Museum stores agree to purchase the merchandise covered by this order only on the basis of the terms and conditions stated herein."

103.   In performing the acts alleged herein, including selling the products described in the Complaint, the direct-sale Defendants knowingly violated terms of their contracts, purchase orders, and invoices which were designed to protect the government and consumers.

2.   Implied Warranties

104.   The Uniform Commercial Code (UCC) applies to goods purchased by the United States.  See, e.g., United States v. Hext, 444 F.2d 804 (5th Cir. 1971); Everett Plywood & Door Corp. V. United States, 419 F.2d 425 (Ct. Cl. 1969); United States v. Wegematic Corp., 360 F.2d 674 (2d Cir. 1966).  As such, the government is entitled to the benefits of its implied warranty provisions.

105.   UCC § 2-314(a) establishes that an implied warranty of merchantability exists with every sale of goods.  The goods must: meet the contract description according to the usual standards of the trade; be of fair or average quality; be fit for the "ordinary purposes" of the goods; run of even quality within the normal range of variation; be adequately contained, packaged and labeled; and

conform to any promises of fact made on their container or label. UCC § 2-314(b).

106. The UCC also establishes an implied warranty of fitness for a particular purpose. The section states: "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is . . . an implied warranty that the goods shall be fit for such purpose." UCC § 2-315.

107. Federal Acquisition Regulations (FARs) also prescribe the procedures for the warranties, inspections and quality assurances that are required in government procurement contracts. The products at issue in the Complaint are designated as "commercial items" under FAR 2.101. That provision defines commercial items as: "(1) Any item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes, and (i) has been sold, leased, or licensed to the general public; or (ii) has been offered for sale, lease, or license to the general public." FAR 2.101(1).

108. With some exceptions, FAR 12 establishes the policies and procedures applicable to the purchase of commercial items by the federal government. FAR 12.301(b)(3) instructs contracting officers to insert FAR 52.212-4 into their contracts. FAR 52.212-4 states that both express and implied warranties of fitness and merchantability are applicable to the contract. FAR 52.212-4(o). It further instructs governmental entities to insert into contracts for

commercial items the requirement that "[t]he Contractor shall comply with all applicable Federal, State and local laws, executive orders, rules and regulations applicable to its performance under [the] contract."  FAR 52.212(q).

109.  While contracting officers may alter specific warranties, they are directed to retain express and implied warranties of fitness and merchantability.  FAR 12.404.  FAR 12.404(a) directs contracting officers on the appropriate standards for modifying warranties; it expressly provides that the implied warranty of merchantability and the implied warranty of fitness for a particular purpose are provisions that should be included in each federal contract for the acquisition of commercial items.  Moreover, FAR 12.404(b) directs that express warranties should be utilized when customary to commercial trade.  Even when utilizing express warranties, the implied warranties should only be limited or waived if the express warranty provides for the government's recovery for items discovered to be defective after acceptance of the items.

110.  FAR 46 sets out the inspection, quality assurance, and warranty provisions required in government contracts, and specifically addresses the requirements for commercial goods.  It states that a commercial goods contractor's existing quality assurance program operates as a substitute for government inspection unless customary practice in the non-governmental market is different.  FAR 46.102(f).  This determination is reiterated in FAR 46.202-1.

111.   Upon information and belief, through their sales of
dangerous and defective products containing illegal quantities of
lead, and their knowing failure to disclose the dangerous and illegal
nature of such products, the direct-sale Defendants have knowingly
violated various contract, purchase order, and invoice provisions
applicable to their sale of such products to the United States.   In
addition, through such conduct, the direct-sale Defendants have
knowingly violated express and implied warranty provisions, as well
as inspection and quality assurance provisions, set forth in the UCC
and FARs.

112.   Many of the products sold to the United States by such
Defendants contain United States' emblems or other national
insignias, such as agency logos, seals, and other identifying
markings.   Upon information and belief, the direct-sale Defendants
knowingly sold products, including those manufactured overseas, in
which the manufacturers or vendors of the products failed to obtain
appropriate agency authorization for use of such emblems, insignias
and logos (see paragraph 98, above).

113.   Upon information and belief, by failing to obtain formal
agency approval for the sale of their defective products bearing the
agencies' insignias, seals or logos, the direct-sale Defendants
deprived the agencies of the opportunity to inspect and examine the
products and determine their fitness for sale.   By otherwise selling
the products to the government, these Defendants knowingly and
falsely certified, either expressly or impliedly, that the products

had undergone such official agency inspection, examination and approval.

## X.   DEFENDANTS' KNOWLEDGE

114.  The danger of lead in consumer products -- especially products designed to be placed in a consumer's mouth -- has been well-known for years.  Upon information and belief, Defendants were at all times relevant to the Complaint, and continue to be, clearly aware of the dangers inherent in manufacturing, selling, distributing and offering for sale products that contain lead paint.  Moreover, Defendants were at all times relevant to the Complaint, and continue to be, aware that their defective products contain large and illegal quantities of lead.

### A.   The Society of Glass and Ceramic Decorators

115.  For example, the Society of Class and Ceramic Decorators (SGCD) issued a report in February 2003, Tenth Edition, written by General Counsel James A. Calderwood, entitled "Lead and Other Heavy Metals: Where Does the Decorating Industry Stand?"  ("Report").  The report provides extensive information about the legal requirements pertaining to lead and available lab testing to ensure compliance. Among other things, the publication states:

A.    "Our purpose here is to provide, in a concise and understandable manner, the current status of various laws and regulations concerning heavy metals such as lead, that impact upon decorated glass and ceramic ware."  Report, at 1.

B.    "We present here only a brief overview; this cannot substitute for individual legal advice concerning particular

situations relating to decorated items and methods." Report, at 1.

C.    "The Society of Glass and Ceramic Decorators (SGCD) promotes the production of products that are safe for people to use and that will reduce environmental degradation." Report, at 1.

D.    "Many important advances are being made in the decorating industry to reduce and limit the use of heavy metals.  For example, color manufacturers, working closely with decorators, have made significant progress in developing unleaded and low-lead systems. There now are several lines of unleaded colors on the market, although not all colors in the spectrum are as yet available.  Even those colors with lead contain less lead than they did in the past." Report, at 1-2.

E.    "We actively encourage our members to follow all the laws and applicable standards.  Of course, we cannot guarantee particular products.  Most reputable decorators have made a personal or corporate commitment to the quality of what they produce." Report, at 2.

F.    "As many consumers have recognized, a ceramic mug, dinner plate or glass tumbler used for food or beverages such as coffee, milk, and soft drinks, can be reused thousands of times over a number of years." Report, at 13.

G.    "We actively encourage compliance among all segments of the industry. ... SGCD has worked with the FDA and other federal agencies, as well as with state governments and Congress, to develop responsible standards.  SGCD sponsors conferences and seminars that deal with environmental/health/safety matters.  Through our

46

Newsletter and other publications, we keep our members informed on the latest developments.  What can those who produce decorated ware or are the professionals who commercially purchase it do to help insure that the products are safe for use?  We offer the following suggestions:

1.    Follow the standards of FDA and certain states as indicated in this paper.

2.    Establish a program of testing that will provide information to customers, on request.

3.    Use unleaded colors, where possible.  The unleaded palette is slightly subdued, less brilliant than lead-bearing colors.  However, lead-free techniques are rapidly improving and multiplying.

4.    Belong to recognized professional organizations such as SGCD that monitor these issues and keep you informed.

5.    Attend professional programs reporting on health and safety developments, uses of materials and equipment and new products." Report, at 13-14.

B.    The Coalition of Safe Ceramicware, Inc.

116.  In addition to the SGCD, the Coalition of Safe Ceramicware, Inc. ("CSC") is another trade association that describes its membership as "compris[ing] the majority of the world's leading manufacturers and distributors of ceramic ... tableware."  April 4, 2003 letter of Counsel Michael Kershow to U.S. Food and Drug Administration ("2003 letter"), at 1.  The CSC was founded in 1989 "in direct response to the ... FDA's concerns about the use of lead

as a component of ceramic glazes and decorations."  May 14, 2004
letter of Counsel Michael Kershow to the Commission for
Environmental Cooperation ("2004 letter"), at 1.

117.  After attempting to address the FDA's concerns about lead
in ceramic products, the CSC "embarked upon a number of initiatives
designed to limit leachable lead levels in its members' products,"
including "adoption of a quality assurance program to ensure members'
consistent compliance with the reduced regulatory limits on leachable
lead in ceramicware issued by the agency in 1992 and the joint
promulgation (with the Society of Glass and Ceramic Decorators) of a
voluntary standard for leachable lead in external decorations in the
"lip-rim" area (i.e, top 20 mm) of the external surface of glass and
ceramic drinking vessels."  2004 letter, at 1.

118.  The CSC "support[s] appropriate FDA oversight over the
safety of their ... products."  2003 letter, at 3.  Indeed, it
recognizes "that FDA properly has the authority to take enforcement
action under the FD&C Act in those cases where it deems leachable
lead levels in ceramic or crystal tableware to constitute a threat to
public health."  Id.

119.  The CSC "certainly shares the ... objective of reducing
the exposure of persons - particularly, children - in the United
States, Canada and Mexico to toxic chemicals such as lead."  2004
letter, at 2.  Indeed, the trade association claims that, since its
founding and through its educational efforts such as workshops and
advocacy, responsible members of its industry have moved away from
use of lead in ceramics to comply with FDA concerns.  Id. at 1-2.

It states:

> The use of unleaded glazes is now common throughout the
> industry.  Unleaded color systems are also increasingly
> being used, although unleaded formulations are not yet
> available for the entire color palette in all product
> applications.  But across the board, even where lead is
> still being employed in particular products, improved
> quality assurance systems have led to substantial
> reductions in the amounts of leachable lead - that is, the
> quantity of lead that can migrate from the glaze or pigment
> into foods - in CSC members' products.  As a result,
> leachable lead values in ceramic tableware are today only a
> fraction of the levels that prevailed 15 years ago.

2004 Letter, at 2.  Ultimately, it concludes that "its members have

dramatically reduced the levels of leachable lead in the products."

Id.

120.  For all times applicable to the complaint, through

education, advocacy and other industry and trade association efforts,

the dangers of lead in ceramic and glassware were well known to those

who manufactured, distributed and sold such products.  The Defendants

in this case knowingly and intentionally ignored those dangers to

sell and distribute defective products to the government and

consumers.

C.    Consent Judgments

121.  Moreover, on and after the times set forth below, some

Defendants knew of concerns that their specific glassware and

ceramics products contained illegal quantities of lead.  The

Defendants settled civil claims in California arising from their sale

of such products, and entered into consent judgments through which

they agreed to: (1) pay civil penalties, and (2) reformulate their

products to eliminate dangerous levels of lead.  Each consent

judgment expressly provides the "reformulation standards"
establishing the maximum levels of lead permitted in consumer
products sold by Defendants in California.  The judgment also sets
forth the dates by which the Defendants were required to comply with
the reformulation.

122.  On July 30, 2004, Smith News received notice from citizen
enforcer and Relator herein Russell Brimer that its sale of consumer
products with high quantities of lead violated California law.
Following discovery, the disclosure of evidence and subsequent
negotiation, Smith News agreed to the terms of a consent judgment on
April 4, 2005, regarding its sale of ceramic ware and glassware
products used for the consumption of food and beverages that contain
lead.  As part of the consent judgment, Smith News agreed to pay up
to $100,400 in civil penalties.  Additionally, the consent judgment
requires Smith News to meet strict reformulation standards.  A
product subject to the consent judgment must not contain materials
used for decorative artwork or designs on the exterior of the product
that contain more than 0.06% lead by weight; or the colored artwork
or designs on the exterior surface of the product may not leach more
than 1.0 ug of total lead so long as the artwork or designs do not
extend into the lip or rim area.  Smith News also committed to
conform as many of the products as commercially reasonable to the
reformulation standards.

123.  On October 4, 2005, Smith-Western agreed to the terms of a
consent judgment regarding its sale in California of ceramic ware and
glassware products containing lead.  As part of the consent judgment,

Smith-Western agreed to pay up to $22,500 in civil penalties. Additionally, the consent judgment requires Smith-Western to meet strict reformulation standards. A product subject to the consent judgment used for the consumption of food and beverages: (1) must not contain materials used for decorative artwork or designs on the exterior of the product that contain more than (a) 0.06% lead by weight (0.02% if the material is used in the lip and rim area) or (b) 0.99 ppm for a ceramic product if the C927 test method is utilized (0.5 ug/ml if the material is used in the lip and rim area); or (2) the colored artwork or designs on the exterior surface of a product must not produce a test result higher than 1.0 ug of lead applied on the decorated portions of the exterior surface as outlined in NIOSH method no. 9100. If a product is marketed towards children, no materials containing more than 0.06% lead by weight may be used on exterior surfaces of the product. For a product not used for the consumption of food or beverages, there must be less than 4.0 ug of total lead on all decorated surfaces. Smith-Western is required to meet these reformulation standards for 80% of the products by December 31, 2006, and for 100% of the products by January 1, 2007.

**XI.  DAMAGES**

124.  Because the details of each and every false and fraudulent claim made to the United States as a result of the above allegations are more particularly within the Defendants' knowledge, the governments' actual damages are not specifically known at the present time. Relators, however, estimate that the total liability of the Defendants amounts to millions of dollars.

**Count I**

**False Claims Act 31 U.S.C. § 3729(a)(1) and (a)(2)**

125.  Relators repeat and reallege each and every allegation contained in paragraphs 1 through 124 above as though fully set forth herein.

126.  This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 et seq., as amended.

127.  Through the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States, within the meaning of 31 U.S.C. § 3729(a)(1).

128.  Through the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted material facts, to get false and fraudulent claims paid or approved, within the meaning of 31 U.S.C. § 3729(a)(2).

129.  The United States, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, paid and continues to pay claims that would not be paid but for Defendants' unlawful conduct.

130.  As a result of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

131.  Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made

and caused to be made by Defendants arising from their unlawful conduct as described herein.

## Count II

### False Claims Act 31 U.S.C. § 3729(a)(7)

132.  Relators repeat and reallege each and every allegation contained in paragraphs 1 through 124 above as though fully set forth herein.

133.  This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. §§ 3729 et seq., as amended.

134.  Through the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States, within the meaning of 31 U.S.C. § 3729(a)(7).

135.  As a result, monies were lost to the United States through the non-payment or non-transmittal of money or property owed to the United States by the Defendants, and other costs were sustained by the United States.

136.  By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

137.  Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every false record or statement knowingly made, used, or caused to be made or used to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

## Count III

### False Claims Act 31 U.S.C. § 3729(a)(3)

138.  Relators repeat and reallege each and every allegation contained in paragraphs 1 through 124 above as though fully set forth herein.

139.  This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. §§ 3729 _et_ _seq_., as amended.

140.  Through the acts described above, Defendants, acting together in concert as each others' contractors, agents, partners, and/or representatives in selling and/or offering for sale the defective and illegal products described herein and submitting false claims, records and statements therefor without disclosing material facts about the products, were acting within the course, scope and authority of such contract, agency, partnership and/or representation for such conduct.  The Defendants conspired to defraud the United States by getting false or fraudulent claims allowed or paid, within the meaning of 31 U.S.C. § 3729(a)(3).

141.  By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

142.  Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every false claim allowed or paid through the Defendants' conspiracy to defraud the United States.

**Prayer**

WHEREFORE, Relators pray for judgment against the Defendants as follows:

1.     That Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729 <u>et</u> <u>seq.</u>;

2.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of 31 U.S.C. § 3729;

3.     That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

4.     That Relators be awarded all costs of this action, including attorneys' fees and expenses; and

5.     That Relators recover such other and further relief as the Court deems just and proper.

## Demand for Jury Trial

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a trial by jury.

Dated: May 22, 2006

HIRST & CHANLER LLP

By: _____
Michael A. Hirst, Esq.
Clifford A. Chanler, Esq.

Hirst & Chanler LLP
Wells Fargo Center
400 Capitol Mall, Suite 900
Sacramento, CA 95814
Phone: (916) 449-3905
Fax:   (916) 449-8258


TROUTMAN & SANDERS LLP

By: _____  Bar No. 56820
Mark E. Nagle, Esq.
D.C. Bar No. 416364

Troutman Sanders LLP
401 Ninth Street, NW
Suite 1000
Washington, D.C. 20004-2134
Tel: (202) 274-2950
Fax: (202) 274-2994

Attorneys for Relators
Whitney Leeman and Russell
Brimer