IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| ex rel. RUSSELL BRIMER and | ) | |
| WHITNEY LEEMAN, | ) | |
| 400 Capitol Mall, #900 | ) | |
| Sacramento, CA 95814 | ) | |
| | ) | |
| Plaintiffs, | ) | **CASE NO 1:06CV00953  JDB** |
| | ) | |
| v. | ) | **FIRST AMENDED COMPLAINT** |
| | ) | |
| ANHEUSER-BUSCH COMPANIES, | ) | |
| INCORPORATED | ) | **DEMAND FOR JURY TRIAL** |
| One Busch Place | ) | |
| Saint Louis, MI  63118; | ) | **FILED UNDER SEAL** |
| | ) | |
| ARAMARK CORPORATION | ) | |
| 1101 Market Street | ) | |
| Philadelphia, PA  19107; | ) | |
| | ) | |
| BRYANT GROUP, INCORPORATED | ) | |
| 18 Celina Avenue, Suite 14 | ) | |
| Nashua, NH 03062; | ) | |
| | ) | |
| BUSINESS INNOVATIONS | ) | |
| WORLDWIDE, LLC | ) | |
| 6579 Peachtree Industrial Boulevard | ) | |
| Norcross, GA  30092; | ) | |
| | ) | |
| CAPSCO INCORPORATED | ) | |
| 5107 Berwyn Road, Suite C | ) | |
| College Park, MD  20740; | ) | |
| | ) | |
| CATSTUDIO | ) | |
| 1340 Industrial Avenue, Suite A | ) | |
| Petaluma, CA  94952; | ) | |
| | ) | |
| CEDAR KEY DESIGN/MAURICE | ) | |
| SPORTING GOODS, INC. | ) | |
| 1910 Techny Road | ) | |
| Northbrook, IL 60062; | ) | |

```
CUSTOM SOUVENIR & NOVELTY             )
5215 Wellingotn Avenue                )
Ventnor City,  NJ 08406;              )
                                      )
CUTHBERTSON IMPORTS, INCORPORATED     )
6 Holly Hock Road                     )
Wilton, CT  06897;                    )
                                      )
DELAWARE NORTH COMPANIES              )
INCORPORATED                          )
40 Fountain Plaza                     )
Buffalo, NY  14202;                   )
                                      )
DESIGN MASTER                         )
ASSOCIATES, INCORPORATED              )
3005 John Deere Road                  )
Toano, VA  23168;                     )
                                      )
EASTERN DESIGN COMPANY,               )
INCORPORATED                          )
297 Route 72 West                     )
Suite C163                            )
Manahawkin, NJ  08050;                )
                                      )
EVERGREEN ENTERPRISES,                )
INCORPORATED/CYPRESS ENTERPRISES,     )
INCORPORATED                          )
5915 Midlothian Turnpike              )
Richmond, VA  23225;                  )
                                      )
FICKLIN VINEYARDS                     )
30246 Avenue 7 ½                      )
Madera, CA  93637;                    )
                                      )
GIBSON OVERSEAS, INCORPORATED         )
2410 Yates Avenue                     )
Los Angeles, CA 90040;                )
                                      )
GUEST SERVICES, INCORPORATED          )
3055 Prosperity Avenue                )
Fairfax, VA  22031;                   )
                                      )
HEINEKEN USA INCORPORATED             )
360 Hamilton Avenue                   )
Suite 1103                            )
White Plains, NY  10601;              )
                                      )
JENKINS ENTERPRISES, INCORPORATED     )
4949 W. Bethany Road                  )
North Little Rock, AR  72231;         )
```

```
K&M/NORDIC COMPANY, INCORPORATED    )
5 Tripps Lane                       )
Riverside, RI  02915;               )
                                    )
KAPAN-KENT COMPANY, INCORPORATED    )
2675 Vista Pacific Drive            )
Oceanside, CA  92056;               )
                                    )
RUSS BERRIE AND COMPANY,            )
INCORPORATED                        )
111 Bauer Drive                     )
Oakland, NJ  07436;                 )
                                    )
SILBERNE SOUVENIR SALES,            )
INCORPORATED                        )
2142 Queens Chapel Road, N.E.       )
Washington, D.C.  20018;            )
                                    )
SMITH NEWS COMPANY, INCORPORATED/   )
SMITH NOVELTY COMPANY               )
460 Ninth Street                    )
San Francisco, CA  94103;           )
                                    )
SMITH-WESTERN COMPANY               )
2223 S. 80th Street                 )
Tacoma, WA  98409;                  )
                                    )
THE BOELTER COMPANIES,              )
INCORPORATED                        )
11100 West Silver Spring Road       )
Milwaukee, WI 53225;                )
                                    )
UNITED SOUVENIR & APPAREL,          )
INCORPORATED/ TRAUB COMPANY         )
2700 Sisson Street                  )
Baltimore, MD  21211;               )
                                    )
WESTERN SOUVENIRS INCORPORATED      )
3006 West Saint Louis Street        )
Rapid City, SD  57702;              )
                                    )
U.S. ALLEGIANCE, INCORPORATED       )
63075 NE 19th Street                )
Bend, OR  97701;                    )
```

```
XANTERRA PARKS & RESORTS,          )
INCORPORATED                       )
6312 S. Fiddler's Green Circle,    )
Suite 600N                         )
Englewood, CO  80111;              )
                                   )
and DOES 1 through 50,             )
                                   )
                Defendants.        )
_____)
```

## TABLE OF CONTENTS

I.     NATURE OF THIS ACTION . . . . . . . . . . . . . . . . 1

II.    PARTIES . . . . . . . . . . . . . . . . . . . . . . . 4

III.   JURISDICTION AND VENUE . . . . . . . . . . . . . . . 11

IV.    INTRODUCTION AND BACKGROUND . . . . . . . . . . . . . 12

V.     DANGERS OF LEAD EXPOSURE . . . . . . . . . . . . . . 14

       A.   Lead Exposure Overview . . . . . . . . . . . . . 14

       B.   The History of Lead as a Known Toxic Substance . . . 16

       C.   Adverse Health Effects of Lead . . . . . . . . . 18

            1.   Effects on Children . . . . . . . . . . . . 18

            2.   Effects on Pregnant Women and Fetuses . . . . 21

            3.   Effects on Other Adults . . . . . . . . . . 21

VI.    FEDERAL REGULATION OF LEAD . . . . . . . . . . . . . 22

       A.   The Federal Hazardous Substances Act . . . . . . 24

       B.   The Consumer Product Safety Act . . . . . . . . 27

       C.   The Food and Drug Administration . . . . . . . . 28

VII.   STATE REGULATION OF LEAD . . . . . . . . . . . . . . 30

VIII.  THE ILLEGAL PRODUCTS . . . . . . . . . . . . . . . . 32

IX.    ALLEGATIONS . . . . . . . . . . . . . . . . . . . . 34

       A.   Concessioners . . . . . . . . . . . . . . . . . 34

       B.   Manufacturers, Distributors and Vendors . . . . . 45

            1.   Express Warranties . . . . . . . . . . . . 46

                 a.   Products Sold on Military Bases, Military
                      Museums and On-Line Shopping Sites . . . 46

                 b.   Products Sold at National Landmarks and
                      Other Federal Facilities . . . . . . . . 51

            2.   Implied Warranties . . . . . . . . . . . . . 52

X.     DEFENDANTS' KNOWLEDGE . . . . . . . . . . . . . . . 56

       A.   The Society of Glass and Ceramic Decorators . . . 56

       B.   The Coalition of Safe Ceramicware, Inc. . . . . . 59

       C.   Consent Judgments . . . . . . . . . . . . . . . 61

XI.    DAMAGES . . . . . . . . . . . . . . . . . . . . .  69

       Count I
            False Claims Act 31 U.S.C. § 3729(a)(1) and (a)(2)  69

       Count II
            False Claims Act 31 U.S.C. § 3729(a)(7)  . . . . .  71

       Count III
            False Claims Act 31 U.S.C. § 3729(a)(3)  . . . . .  72

       Prayer  . . . . . . . . . . . . . . . . . . . . . .  73

Plaintiffs Russell Brimer and Whitney Leeman, through their attorneys Hirst & Chanler LLP and Troutman Sanders LLP, on behalf of the United States of America, and based upon personal knowledge, relevant documents, and information and belief, allege as follows:

## I.    NATURE OF THIS ACTION

1.    This action alleges that Defendant concessioners, manufacturers, distributors and vendors of decorative glassware, ceramic ware and other consumer products knowingly submitted false and fraudulent claims to the United States and knowingly sold to the United States illegal, harmful and defective products containing toxic quantities of lead.  The government sustained damages by: paying for defective products it would never have purchased but for the fraud and concealment of Defendants; having Defendants sell such products bearing government emblems, insignias, logos and other markings decorated with illegal quantities of lead paint in federally-owned locations of national importance, including retail stores in Congress, the Supreme Court, the White House, federal agencies, national parks, presidential libraries, military bases and other national landmarks; and suffering financial and other harm to its interests and reputation by placing federal employees and the public in danger as a direct consequence of Defendants' fraud.

2.    Defendants' knowing submission of false and fraudulent claims for payment constitutes a violation of the Federal False

Claims Act, 31 U.S.C. § 3729 et seq. ("FCA" or "Act").  As a result of their fraudulent conduct, Defendants have caused the government to sustain a direct loss of funds, damage to its interests, and probable injury to its employees and other citizens.

3.    The FCA was originally enacted at the request of President Lincoln during the Civil War.  The president believed that the Union Army was being defrauded, in part by unscrupulous contractors who were providing defective or useless products, including military supplies and ammunition.  The Act was substantially amended by Congress in 1986 to enhance the government's ability to recover losses sustained as a result of defendants' fraud.  At that time, Congress determined that fraud against the government was pervasive and that the FCA, which Congress described as the primary tool for combating government fraud, was in need of reform.  Congress intended that the 1986 amendments create incentives for individuals with knowledge of fraud against the United States to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecute fraud on the government's behalf.

4.    The FCA prohibits knowingly presenting, or causing to be presented, to the federal government a false or fraudulent claim for payment or approval, and conspiring to defraud the government by getting a false or fraudulent claim allowed or paid.  31 U.S.C. § 3719(a)(1), (a)(3).  Additionally, it

prohibits knowingly making or using, or causing to be made or used, a false or fraudulent record or statement (a) to get a false or fraudulent claim paid or approved by the federal government or (b) to conceal, avoid, or decrease an obligation to pay or transmit money or property to the federal government.  31 U.S.C. § 3729(a)(2), (a)(7).  Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the loss sustained by the United States.  31 U.S.C. § 3729(a)(7).

5.    The FCA defines "knowing" as having actual knowledge that the information is false, or acting with a deliberate ignorance of, or reckless disregard for, the truth or falsity of the information.  31 U.S.C. § 3729(b).

6.    The statute allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery obtained.  The Act requires that the Complaint be filed under seal for a minimum of 60 days, without service on the defendant during that time, to allow the government time to conduct its own investigation and to determine whether to join the suit.

7.    Based on the FCA, qui tam plaintiffs and relators Russell Brimer and Whitney Leeman ("Relators") seek to recover all available damages, civil penalties, and other relief for the federal violations alleged herein, in every jurisdiction to which the Defendants' fraud has extended.

8.    While all of the Defendants who engaged in the
fraudulent conduct are not presently known by Relators, and the
precise amount of the loss to the federal government cannot
presently be determined, it is estimated that the damages and
civil penalties that may be assessed against the Defendants under
the facts alleged in the Complaint amount to several millions of
dollars.

## II.  PARTIES

9.    Relator Whitney Leeman ("Dr. Leeman") is a resident of
Sacramento, California, with Bachelor of Science, Masters of
Science, and Ph.D. degrees in environmental engineering.  She is
currently an Air Resources Engineer in the Research Division of
the California Air Resources Board.  Dr. Leeman specializes in
risk assessment and exposure to toxic chemicals analysis,
including exposure to lead from consumer products and associated
health risks.  Dr. Leeman, working with Relator Russell Brimer,
has investigated, purchased, and analyzed the products at issue
in this case.

10.    Relator Russell Brimer ("Mr. Brimer") is a resident of
Emeryville, California.  Mr. Brimer is an investigator with
substantial experience in lead testing, having performed over
5,000 field investigations of consumer products to determine
their lead content.  Working with Dr. Leeman, Mr. Brimer has
investigated, purchased and analyzed the products at issue in
this case.

11.    Defendant Aramark Corporation ("Aramark") is a
Delaware corporation, with its principal office located at 1101
Market Street, Philadelphia, Pennsylvania.  Aramark, among other
businesses, distributes consumer products and manages and
operates retail stores in national parks and other locations.  In
2005, Aramark had sales revenue of over $10 billion.

12.    Defendant Anheuser-Busch Companies, Incorporated
("Anheuser-Busch") is a Missouri corporation, with its principal
office located at One Busch Place, Saint Louis, Missouri.
Anheuser-Busch manufactures and/or distributes consumer products.
In 2005, Anheuser-Busch had sales revenue of over $15 billion.

13.    Defendant Bryant Group, Incorporated ("Bryant Group")
is a New Hampshire corporation, with its principal office located
at 18 Celina Avenue, Suite 14, Nashua, New Hampshire.  Bryant
Group manufactures and/or distributes consumer products.  Its
annual sales revenue is not presently known.

14.    Defendant Business Innovations Worldwide, LLC d/b/a
Lion Marketing ("Business Innovations") is a Georgia corporation
with its principal office located at 6579 Peachtree Industrial
Boulevard, Norcross, Georgia.  Business Innovations manufactures
and/or distributes consumer products.  Its annual sales revenue
is estimated at over $5 million.

15.    Defendant Capsco, Incorporated ("Capsco") is a
corporation with its principal office located at 5107 Berwyn
Road, Suite C, College Park, Maryland.  Capsco manufactures
and/or distributes consumer products.  Its annual sales revenue
is not presently known.

16.    Defendant Catstudio is a California company, with its principal office located at 1340 Industrial Avenue, Suite A, Petaluma, California.  Catstudio manufactures and/or distributes consumer products.  Its annual sales revenue is estimated at $1 million - $2 million.

17.    Defendant Cedar Key Design/Maurice Sporting Goods, Incorporated ("Cedar Key Design")is an Illinois corporation, with its principal office located at 1910 Techny Road, Northbrook, Illinois.  Cedar Key Design manufactures and/or distributes consumer products. Its annual sales revenue is estimated at $50 million to $100 million.

18.    Defendant Custom Souvenir & Novelty ("Custom Souvenir") is a Delaware corporation, with its principal office located at 5215 Wellington Avenue, Ventnor City, New Jersey. Custom Souvenir  manufactures and/or distributes consumer products.  In 2005, Custom Souvenir had sales revenue of over $2 million.

19.    Defendant Cuthbertson Imports, Incorporated ("Cuthbertson Imports") is a Connecticut corporation, with its principal office located at 6 Holly Hock Road, Wilton, Connecticut.  Cuthbertson Imports manufactures and/or distributes consumer products.  Its annual sales revenue is estimated at $15 million.

20.    Defendant Delaware North Companies Incorporated ("Delaware North") is a Delaware corporation, with its principal office located at 40 Fountain Plaza, Buffalo, New York.  Delaware

North, among other businesses, distributes consumer products, and manages and operates retail stores in national parks and other locations.  In 2005, Delaware North had sales revenue of nearly $2 billion.

21.   Defendant Design Master Associates, Incorporated ("Design Master") is a Virginia corporation, with its principal office located at 3005 John Deere Road, Toano, Virginia.  Design Master manufactures and/or distributes consumer products.  Its annual sales revenue is estimated at $5 - $10 million.

22.   Defendant Eastern Design Company, Incorporated ("Eastern Design") is a New Jersey corporation, with its principal office located at 297 Route 72 West, Suite C163, Manahawkin, New Jersey.  Eastern Design manufactures and/or distributes consumer products.  Its annual sales revenue is estimated at $1 to $2.5 million.

23.   Defendant Evergreen Enterprises, Incorporated/Cypress Enterprises, Incorporated ("Evergreen Enterprises") is a Virginia corporation, with its principal office located at 5915 Midlothian Turnpike, Richmond, Virginia.  Evergreen Enterprises manufactures and/or distributes consumer products.  Its annual sales revenue is estimated at $20 million to $50 million.

24.   Defendant Ficklin Vineyards is a California corporation, with its principal office located at 30246 Avenue 7 1/2, Madera, California.  Ficklin Vineyards manufactures and/or distributes consumer products.  In 2005, Ficklin Vineyards had sales revenue of over $420,000.

25.    Defendant Gibson Overseas, Incorporated ("Gibson Overseas") is a California corporation, with its principal office located at 2410 Yates Avenue, Los Angeles, California.  Gibson Overseas manufactures and/or distributes consumer products.  In 2005, Gibson Overseas had sales revenue of over $100 million.

26.    Defendant Guest Services, Incorporated ("Guest Services") is a District of Columbia corporation, with its principal office located at 3055 Prosperity Avenue, Fairfax, Virginia.  Guest Services, among other businesses, distributes consumer products and manages and operates retail stores in national parks and other locations.  In 2004, Guest Services had sales revenue of over $239 million.

27.    Defendant Heineken USA Incorporated ("Heineken") is a New York corporation, with its principal office located at 360 Hamilton Avenue, Suite 1103, White Plains, New York.  Heineken manufactures and/or distributes consumer products.  Its annual sales revenue is estimated at $50 million to $100 million.

28.    Defendant Jenkins Enterprises, Incorporated ("Jenkins Enterprises") is an Arkansas corporation, with its principal office located at 4949 W. Bethany Road, North Little Rock, Arkansas.  Jenkins Enterprises manufactures and/or distributes consumer products.  In 2005, Jenkins Enterprises had sales revenue of nearly $7 million.

29.    Defendant K&M/Nordic Company, Incorporated ("K&M/Nordic") is a Massachusetts corporation, with its principal office located at 5 Tripps Lane, Riverside, Rhode Island.

K&M/Nordic Company manufactures and/or distributes consumer products.  Its annual sales revenue is estimated at $10 to $20 million.

30.    Defendant Kapan-Kent Company, Incorporated ("Kapan-Kent") is a California corporation, with its principal office located at 2675 Vista Pacific Drive, Oceanside, California. Kapan-Kent manufactures and/or distributes consumer products. Its annual sales revenue is estimated at $2.5 million - $5 million.

31.    Defendant Russ Berrie and Company, Incorporated ("Russ Berrie") is a New Jersey corporation, with its principal office located at 111 Bauer Drive, Oakland, New Jersey.  Russ Berrie manufactures and/or distributes consumer products.  In 2005, Russ Berrie had sales revenue of over $290 million.

32.    Defendant Silberne Souvenir Sales, Incorporated ("Silberne Souvenir") is a District of Columbia corporation, with its principal office located at 2142 Queens Chapel Road, N.E., Washington, D.C.  Silberne Souvenir manufactures and/or distributes consumer products.  Its annual sales revenue is estimated at $10 - $20 million.

33.    Defendant Smith News Company, Inc./Smith Novelty Company ("Smith News") is a California corporation, with its principal office located at 460 Ninth Street, San Francisco, California.  Smith News manufactures and/or distributes consumer products.  In 2004, Smith News had sales revenue of nearly $10 million.

34.    Defendant Smith-Western Company ("Smith-Western") is a Washington company, with its principal office located at 2223 S. 80th Street, Tacoma, Washington.  Smith-Western manufactures and/or distributes consumer products.  In 2004, Smith-Western had sales revenue of over $5.7 million.

35.    Defendant The Boelter Companies, Incorporated ("Boelter") is a Wisconsin corporation, with its principal office located at 11100 W Silver Spring Road, Milwaukee, Wisconsin. Boelter manufactures and/or distributes consumer products.  In 2005, Boelter had sales revenue of over $112 million.

36. Defendant United Souvenir & Apparel, Incorporated a.k.a. Traub Company ("United Souvenir") is a Maryland corporation, with its principal office located at 2700 Sisson Street, Baltimore, Maryland.  United Souvenir manufactures and/or distributes consumer products.  In 2005, United Souvenir had sales revenue of nearly $4 million.

37.    Defendant Western Souvenirs, Incorporated ("Western Souvenirs") is a South Dakota company, with its principal office located at 3006 West Saint Louis Street, Rapid City, South Dakota.  Western Souvenirs manufactures and/or distributes consumer products.  Its annual sales revenue is estimated at $500,000 - $1 million.

38.    Defendant U.S. Allegiance, Incorporated ("U.S. Allegiance")  is an Oregon corporation, with its principal office located at 63075 NE 18th Street, Bend, Oregon.  U.S. Allegiance manufactures and/or distributes consumer products.  In 2005, U.S.

Allegiance had sales revenue of $5,923,278.

39.    Defendant Xanterra Parks & Resorts, Incorporated ("Xanterra") is a Delaware corporation, with its principal office located at 6312 S. Fiddler's Green Circle, Suite 600N, Englewood, Colorado.  Xanterra, among other businesses, distributes consumer products and manages and operates retail stores in national parks and other locations.  In 2005, Xanterra had sales revenue of over $247 million.

40.    The identities of the remaining Doe Defendants who sold, offered for sale, or conspired to sell or offer for sale defective and dangerous consumer products containing illegal quantities of lead paint are presently unknown to Relators.  Both listed Defendants and such additional Doe Defendants served as contractors, agents, partners, and/or representatives of one and another in selling and/or offering for sale the defective and illegal products, and were acting within the course, scope and authority of such contract, agency, partnership and/or representation for the conduct described herein.  Relators will amend their Complaint to identify such additional Defendants when their identities become known.

**III. JURISDICTION AND VENUE**

41.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

42.    Under 31 U.S.C. § 3730(e), there has been no public disclosure of the "allegations or transactions" in the Complaint. Even if there had been any such disclosure, Relators constitute "original sources" pursuant to 31 U.S.C. § 3730(e)(4).

43.    Personal jurisdiction and venue are proper in this district pursuant to 28 U.S.C. §§ 1391(b), 1395(a) and 31 U.S.C. § 3732(a), as one or more of the Defendants or their agents can be found, resides, transacts business, or otherwise engaged in fraudulent conduct within the district.

## IV.    INTRODUCTION AND BACKGROUND

44.    From at least 1996 to the present, Defendants have sold to the United States, or offered for sale, products that contain lead paint in measurable amounts well beyond that allowed by law.  The products, including glasses, mugs, shot glasses, and other glassware and ceramic ware items contain decorative designs, emblems, insignias and other markings.  These goods were manufactured, distributed and sold to the government, and otherwise distributed by Defendants and sold to government employees and the public in government-owned, government-leased or government-operated gift shops and other federal or federally-funded facilities.  Most of the products were designed to contain beverages for consumption by children and adults.  Individuals who purchased and used the products in their normal, intended and reasonably foreseeable manner were exposed to illegal and harmful quantities of lead.  Also exposed to illegal and harmful quantities of lead were those who routinely handled or touched

the products, including store employees and others who packed, labeled, arranged, displayed, stocked or otherwise came into frequent contact with the exterior surface of the product. Defendants knew that sale of their products to the United States would endanger consumers and employees through exposure to illegal quantities of lead, and knew that the United States would not have purchased or allowed sales of the products if the existence of such lead had been disclosed.

45.    Upon information and belief, the Defendants also knowingly violated federal law by failing to obtain agency authorization to affix, apply or otherwise use national insignias, emblems, and logos on their products.  By failing to obtain such required authorization, Defendants deprived the agencies of an opportunity to analyze and inspect the products and potentially discover the illegal use of lead in the painted insignias, emblems, and logos.  Even those defendants that obtained government approval failed to disclose to the government the illegal use of lead in affixing, applying or using the insignias, emblems, and logos.  As more fully set forth below, Defendants then submitted false claims to the agencies for sale of such unauthorized products.

46.    Many of the products sold by Defendants are especially dangerous because the products were intended for use by children and because high quantities of lead are present in the "lip and rim area" of glasses, mugs and other products designed to contain

beverages.  When children and other consumers drink from these products, the lead or lead compound is readily ingested.

**V.    DANGERS OF LEAD EXPOSURE**

    A.    <u>Lead Exposure Overview</u>

    47.    Lead is a heavy metal known to be hazardous to human health.  Unlike some other metals, it has no nutritional value or health benefits.  Instead, it is a known carcinogen and a known reproductive toxin that can cause birth defects, developmental disorders in children, and harm to male and female reproductive systems.  Even tiny amounts of lead can be dangerous to human health.

    48.    Lead can enter the body in a variety of ways, including through the consumption of lead contaminated food or beverages, inhalation of airborne lead contaminants, hand-to-mouth transfers  (transfer of lead from a handled product to the hand that touches  it, then transfer of that lead to the mouth when the person touches his or her mouth with that hand), and dermal absorption (absorption directly through the skin).

    49.    Once in the body, lead passes into the blood stream and migrates to the soft tissues, such as the kidneys, liver, reproductive organs, brain and nervous system, and mineralized tissues, such as the bones and teeth.  The body can neither use nor metabolize lead.  Accordingly, whatever lead enters the body is stored by it, mainly in the bones and teeth.  Once stored, it is only expelled very slowly, over a considerable period of time.

50.   Lead has been found to be so toxic that levels of lead exposure historically thought to be acceptable have now been shown to be dangerous.  Before the 1960s, lead exposure resulting in a blood lead level below 60 micrograms ("ug") per deciliter ("dl") of blood was considered safe.  In 1970, the United States Surgeon General officially defined this level as one of "undue lead absorption."  In 1975, the United States Center for Disease Control ("CDC") reduced this threshold level by half, to 30 ug/dl.  In 1985, the CDC reduced this level further to 25 ug/dl. In 1986, the World Health Organization determined that 20 ug/dl should be the permissible limit.  Then, in 1989, the Science Advisory Board of the Environmental Protection Agency stated that "there is likely to be *no threshold* for lead neurotoxicity, at least within the contemporary range of blood lead levels...." (emphasis added).  Many federal agencies have for several years regarded a blood lead level above 10 ug/dl as unacceptable. Today, there is no level of lead consumption, no matter how low, that the modern scientific community recognizes as safe.

51.   The California Superior Court recently held a major retailer liable for selling glassware decorated with lead paint without adequate warnings to consumers of the health hazards the products posed.  The court stated:

> All experts, including those of Defendants, agree
> that lead – in any amount – serves absolutely no
> beneficial purpose for the human body.  All of the
> experts further agree that lead is a reproductive
> toxicant that causes birth defects and other
> reproductive harm. . . .

[Plaintiff's] experts testified that there is no
known level of human exposure to lead that is safe
and free from risk of reproductive or other
toxicity.  The Court took judicial notice of
documents that relate to this opinion.  The
[Federal Food and Drug Administration] specifically
states that there are "no levels of lead exposure
for children or adults at which it may be
considered that no adverse effect occurs."
Similarly, "safe levels of lead exposure have not
been identified."  California's [Environmental
Protection Agency] . . . also specifically cautions
that, "a clear no-observed-effect concentration has
not been established for such [lead]-related
endpoints as birth weight, gestation period, heme
synthesis, [and] neurobehavioral development in
children and fetuses . . .

DiPirro v. J.C. Penney Co., Inc., et al., San Francisco County

Superior Court, No. 407150, Statement of Decision filed February

9, 2005, at 30-31.

B.    The History of Lead as a Known Toxic Substance

52.    The poisonous nature of lead has been known for

centuries.  The dangers and toxicity of lead were noted as early

as 2000 B.C. by Dioscerides, when he wrote, "lead makes the mind

give way."  In ancient Rome, lead was widely used in cooking

utensils, wine urns and plumbing, probably accounting for the

unprecedented epidemics of gout, sterility among males, and

infertility and stillbirths among females.  Indeed, some scholars

and historians believe that lead exposure was a major

contributing factor to the fall of the Roman Empire.

53.    In the nineteenth and twentieth centuries, lead

poisoning of adults was principally occupational in origin.

Factory workers were exposed to lead through inhalation,

absorption, and consumption of lead contaminated food.  British

factory inspectors at the turn of the twentieth century noted that women exposed to lead tended to be more barren, and that children born to these women were often short-lived.  In his essay "Star of the East," Charles Dickens described the pernicious effects of lead poisoning on a woman who worked in London's white lead mills, writing, "her brain is coming out her ear and it hurts dreadful."

54.    In 1901, France, Belgium and Austria banned white lead interior paint.  Between 1909 and 1934, at least ten European countries imposed similar bans or restrictions.  In 1922, the League of Nations banned the use of white lead interior paint altogether.

55.    By the 1930s, a consensus existed among scientists that lead paint posed a significant health risk to children.  A December 1943 article in *Time Magazine* warned of the dangers to children from chewing on lead painted items such as toys, cribs and windowsills.  In the 1950s and 1960s, cities and states across the United States enacted legislation banning the use of lead paint in homes.

56.    In January 1997, a report to Congress by the United States Department of Health and Human Services ("HHS") catalogued the literally thousands of scientific studies over many years documenting the adverse effects of lead exposure on the health of children and adults ("Report").  The studies cited included those by federal agencies HHS, CDC, HHS' Agency for Toxic Substances and Disease Registry ("ATSDR"), and the National Institute for

Occupational Safety and Health ("NIOSH").  The Report and cited studies demonstrated that, without question, lead is toxic and harmful to humans.

    C.    <u>Adverse Health Effects of Lead</u>

    57.    Lead exposure has been scientifically determined to have adverse health effects on fetuses, children, pregnant women, and other adults.  According to HHS' Report, lead affects all organs and functions of the body to varying degrees and the effect of lead toxicity on the central nervous system is likely irreversible.  Toxic effects can be noted regardless of the "exposure pathway" (the mechanism through which lead enters the body, i.e., ingestion, inhalation, or dermal exposure through handling of the product).  In addition to demonstrated harm to all adults, studies have shown that children and pregnant women are at greatest risk.

    1.    <u>Effects on Children</u>

    58.    Even very low levels of lead exposure can be dangerous to children.  The ATSDR has stated: "[i]t must be emphasized ... that, for children, there may be no threshold for developmental effects.... It is important to interdict all lead exposures." (ATSDR, "Lead Toxicity Physiologic Effects" (6/20/05)).

    59.    Children are more sensitive to lead exposure than adults in large part because their brain and nervous system are still developing.  Specifically, the incomplete development of the blood-brain barrier in young children increases the risk of lead's entry into the developing nervous system, which can result

in prolonged or permanent neurobehavioral disorders.

60.    Lead poisoning is often an asymptomatic disease in children, which means that even children who appear healthy can have dangerous levels of lead in their bodies.  As a consequence, many children suffering from lead poisoning do not have their disease diagnosed until their symptoms become severe.

61.    Children with high blood lead levels may suffer from a variety of neurological disorders, including: progressive loss of memory and cognitive ability, personality changes, inability to concentrate, lethargy, muscle atrophy and weakness, tremors, myoclonus (involuntary muscular twitching), nystagmus (rapid, involuntary eye movement), dementia, seizures, loss of ability to swallow or speak, and progressive loss of consciousness.  In severe cases, children with high levels of lead may suffer permanent neurological damage that can result in severe retardation, recurrent convulsions, and death.

62.    Recent studies have shown that even low levels of childhood lead exposure cause or contribute to: anemia; slowed growth; impaired speech and hearing; learning disabilities; decreased intelligence; diminishment of balance, visual skills, fine motor skills, verbal skills, attention, concentration, and impulse control; early signs of attention deficit hyperactivity disorder or "ADHD"; and increased criminal behavior.  One study that followed children into adulthood found a sevenfold increase in the risk of a child developing a reading disability, when he or she was exposed to sufficient levels of lead as a toddler.

63.   Studies further show that the risk of lead exposure is disproportionately high for certain groups of children, including children of poor families, of Hispanic heritage, residing in large metropolitan areas or living in older housing.  An April 2003 study reported in the *New England Journal of Medicine* examined blood lead levels of girls ages 8 to 18 and found that low-level lead exposure was associated with a delay in the onset of puberty for Hispanic and African-American girls.

64.   In a 1991 report on preventing lead poisoning in young children, the CDC stated:

> Childhood lead poisoning is one of the most common pediatric health problems in the United States today, and it is entirely preventable. Enough is now known about the sources and pathways of lead exposure and about ways of preventing this exposure to begin the efforts to eradicate permanently this disease.  The persistence of lead poisoning in the United States, in light of all that is known, presents a singular and direct challenge to public health authorities, clinicians, regulatory agencies, and society.
>
> LEAD POISONING IS ONE OF THE MOST COMMON AND PREVENTABLE PEDIATRIC HEALTH PROBLEMS TODAY.
>
> Lead is ubiquitous in the human environment as a result of industrialization.  It has no known physiologic value.  Children are particularly susceptible to lead's toxic effects.  Lead poisoning, for the most part, is silent: most poisoned children have no symptoms.  The vast majority of cases, therefore, go undiagnosed and untreated.  Lead poisoning is widespread.  No socioeconomic group, geographic area, or racial or ethnic population is spared.  (Emphasis in  original).

65.   In 1992, Congress adopted official findings on lead exposure in children.  The United States Code provides: "The Congress finds that: (1) low-level lead poisoning is widespread among American children, afflicting as many as 3,000,000 children

under age 6 [and] (2) at low levels, lead poisoning in children causes intelligence quotient deficiencies, reading and learning disabilities, impaired hearing, reduced attention span, hyperactivity, and behavior problems...."  42 U.S.C. § 4851.

    2.   <u>Effects on Pregnant Women and Fetuses</u>

    66.   Both the mother and fetus face increased dangers from a pregnant woman's exposure to lead.  HHS' Report to Congress identified a special concern for pregnant women since analysis has shown that lead accumulation in the bones is released into the blood during pregnancy.  Historical studies show that high lead exposures produce stillbirths and miscarriages, while several studies in the United States and abroad document exposures to even low lead levels can result in adverse pregnancy outcomes, including shortened gestation, decreased fetal mental development, and decreased fetal growth.  Even after birth, a newborn can be exposed to lead through ingestion of lead-contaminated mother's milk.  Studies show that the amount of lead released from a mother's bones is greatest during the third trimester of pregnancy and lactation.

    3.   <u>Effects on Other Adults</u>

    67.   Childhood neurological effects from exposure can persist into adulthood.  Studies cited by ATSDR correlate lead exposure with lower classroom performance, greater absenteeism, more reading disabilities, and deficits in vocabulary, fine motor skills, reaction time, and hand-eye coordination in young adults more than 10 years after childhood exposure (American Academy of

Pediatrics 1993, Needleman, et al. 1990).  A 1991 study found a higher proportion of learning disabilities among school-aged children with biological parents who were lead poisoned as children *fifty years previously*, suggesting even subsequent offspring of exposed children may be at greater risk for neurologic development impairment.  The ATSDR concluded that "there is a wide range of neurologic effects associated with lead exposure, some of which may likely be irreversible."  ATSDR, Neurologic Effects (6/20/05).

68.    But even without childhood exposure, many of the same adverse effects will be experienced by lead-exposed adults, though the toxicity thresholds tend to be higher.  Studies on lead-exposed adults have demonstrated diminished: IQ scores, reaction time, visual motor performance, hand dexterity, and cognitive performance (ATSDR 1999).  Additional evidence shows lead exposure's effects on adults' postural balance and peripheral nerve function (ATSDR 1997), and lead has been demonstrated to cause parathesia, weakness, dizziness, impotence, malaise, forgetfulness, impaired concentration, depression and mood changes (ATSDR 6/20/05).

## VI.   FEDERAL REGULATION OF LEAD

69.    According to an ATSDR study in 1999 and an American Academy of Pediatrics study in 1993, *lead paint* is a primary source of environmental exposure, and *the major source of lead exposure for children*.  As such, according to the Centers for Disease Control and Prevention, "great effort has been undertaken

in the United States over the past two decades to remove lead
from ... paints."

70.    The current scientific evidence suggests that no
amount of lead is safely ingested, especially by pregnant women
and children.  The ATSDR states on its website: "It must be
emphasized ... that, for children, there may be no threshold for
developmental effects....It is important to interdict all lead
exposures." (http://www.atsdr.cdc.gov/HEC/CSEM/lead/physiologic-
effects.html).

71.    The Consumer Product Safety Commission (CPSC), the
CDC, the Environmental Protection Agency (EPA), the Department of
Housing and Urban Development (HUD), and other federal agencies
have stated that blood lead levels above 10 ug/dl are a health
concern and recommend community-wide preventive measures (see
CDC, 1991; and CPSC, 1992; CPSC, 1996).  Sustained blood lead
levels of 10 ug/dl or greater have been associated with a variety
of adverse health effects, discussed above, including deficits in
neurobehavioral function and intellectual performance,
developmental delays, decreased stature, and diminished hearing
acuity.  To prevent young children from exceeding the 10 ug/dl
blood lead level, the CPSC suggests that chronic ingestion (about
15-30 days considered surrogate for chronic ingestion) of lead
from paint and other consumer products not exceed 15 ug lead/day
(CPSC, 1990).  The limit of 15 ug lead/day is based on human
chronic exposure models relating ingested lead to blood lead
levels (CPSC, 1989, 1990, 1992).  Included in the 15 ug/day limit

is consideration of several parameters such as amount of lead ingested, lead absorption, weight of lead paint, and other "background" sources of lead.

72.   The Federal Hazardous Substances Act (FHSA), 15 U.S.C. §§ 1261 et seq., makes it illegal to ship, buy or sell any misbranded or banned hazardous substance.  15 U.S.C. § 1263. Similarly, the Consumer Product Safety Act (CPSA), 15 U.S.C. §§ 2051 et seq., makes it illegal to manufacture or sell a product that either violates a consumer product safety standard or has been declared a banned hazardous product.  15 U.S.C. § 2068(a)(1),(2).  Both of those statutes outlaw the Defendants' sales of the products in this case, as shown below.

A.   The Federal Hazardous Substances Act

73.   The FHSA defines a hazardous substance as "any substance or mixture of substances which is toxic."  15 U.S.C. § 1261(f)(1)(A)(I).  The term "toxic" applies to "any substance (other than a radioactive substance) which has the capacity to produce personal injury or illness to man through ingestion, inhalation, or absorption through any body surface."  15 U.S.C. § 1261(g).  A hazardous substance "intended, or packaged in a form suitable for use in the household or by children [must] bear a label which states conspicuously ... the signal word "WARNING" or "CAUTION" on all ... hazardous substances."  15 U.S.C. § 1261(p)(1)(D).  A product that fails to contain such a warning is a "misbranded hazardous substance."  Id.

74.    In the Code of Federal Regulations, the CPSC states: "Under the Federal Hazardous Substances Act (FHSA), 15 U.S.C. § 1261(f)(1), household products that expose children to hazardous quantities of lead under reasonably foreseeable conditions of handling or use are 'hazardous substances.'  A household product that is not intended for children but which creates such a risk of injury because it contains lead requires precautionary labeling under the Act.  15 U.S.C. § 1261(p).  A toy or other article intended for use by children which contains a hazardous amount of lead that is accessible for children to ingest is a banned hazardous substance.  15 U.S.C. § 1261(q)(1)(B).  In evaluating the potential hazard associated with products that contain lead, the CPSC considers these major factors on a case-by-case basis: the total amount of lead contained in a product, the bioavailability of the lead, the accessibility of the lead to children, the age and foreseeable behavior of the children exposed to the product, the foreseeable duration of the exposure, and the marketing, patterns of use, and life cycle of the product."  16 C.F.R. § 1500.230(c)(1).

75.    In several instances, the CPSC has acted to recall products containing lead.  It determined that: "had the manufacturers of these lead-containing products acted with prudence and foresight before introducing the products into commerce, they would not have used lead at all.  This in turn would have eliminated both the risk to young children and the costs and other consequences associated with corrective action."

16 C.F.R. § 1500.230(c)(3). The CPSC concluded: "The Commission urges manufacturers to eliminate lead in consumer products to avoid similar occurrences in the future." 16 C.F.R. § 1500.230(c)(4). In its "Guidance for Lead (Pb) in Consumer Products," the CPSC states: "To reduce the risk of hazardous exposure to lead, the Commission requests manufacturers to eliminate the use of lead that may be accessible to children from products used in and around households...." (http://www.cpsc.gov/BUSINFO/leadguid.html).

76.    Apart from manufacturers of products that contain lead, the FHSA imposes requirements on the importers, distributors and retailers of such products. The statute, under "Prohibited Acts," provides that "the following acts and the causing thereof are prohibited: The introduction or delivery for introduction into interstate commerce of any misbranded hazardous substance or banned hazardous substance[;]" and "The receipt in interstate commerce of any misbranded hazardous substance or banned hazardous substance and the delivery or proffered delivery thereof for pay or otherwise." 15 U.S.C. § 1263(a),(c). The Act provides for criminal penalties and imprisonment for violation of the section (with certain good faith exceptions). 15 U.S.C. § 1264(a). Also, as to a manufacturer, importer, private labeler or a distributor (not a retailer unless the retailer had actual knowledge of the misbranded hazardous substance), violation of the section gives rise to civil penalties of $5,000 for each violation with a maximum civil penalty not to exceed $1,250,000

for any related series of violations.  15 U.S.C. § 1264(c).

77.    Accordingly, in 16 C.F.R. § 1500.230, the CPSC states that "under the FHSA, any firm that purchases a product for resale is responsible for determining whether that product contains lead and, if so, whether it is a 'hazardous substance.' The Commission, therefore, recommends that, prior to the acquisition or distribution of such products, importers, distributors and retailers obtain information and data, such as analyses of chemical composition or accessibility, relevant to the determination from manufacturers, or have such evaluations conducted themselves."  16 C.F.R. § 1500.230(c)(5).

B.    The Consumer Product Safety Act

78.    Under the CPSA, if the CPSC finds that a product presents a substantial hazard, it can order manufacturers, distributors and retailers of the product to eliminate or rectify the hazard, and to compensate consumers who have purchased the product.  15 U.S.C. § 2064.

79.    The CPSA also authorizes the CPSC to promulgate consumer product safety standards through regulations, 15 U.S.C. § 2056, and to declare, by regulation, a banned hazardous product if the CPSC finds that a consumer product presents an unreasonable risk of injury, is distributed in commerce, and the safety standard is unsatisfactory to protect the public.  15 U.S.C. § 2057.  Defendants who violate the CPSA are subject to criminal and civil penalties, including imprisonment for up to

one year, a criminal fine of up to $50,000, and a civil fine up to $1.25 million for a series of violations.

80.    In 1977, the CPSC, through regulation, banned paint and other surface-coating materials for consumer use containing more than 0.06% of lead by weight.  It also banned toys, other articles intended for use by children, and furniture bearing paint containing in excess of 0.06% lead by weight.  16 C.F.R. § 1303.  The CPSC issued the ban because it found "an unreasonable risk of lead poisoning in children associated with lead content of over 0.06 percent in paint and coatings to which children have access."  16 C.F.R. § 1303.1(c).

81.    The CPSC has observed that "young children are most commonly exposed to lead in consumer products from the direct mouthing of objects, or handling such objects and subsequent hand-to-mouth activity."  16 C.F.R. § 1500.230(b).

C.    The Food and Drug Administration

82.    The Food and Drug Administration ("FDA") has established maximum levels for leachable lead in ceramic ware, and pieces that exceed those levels are subject to recall or other agency enforcement action.  The levels are based on how frequently an item of ceramic ware is used, the type and temperature of the food it contains, and how long the food stays in contact with the item.  Cups, mugs and pitchers have the most stringent action level, 0.5 parts per million, because they can be expected to hold food longer, allowing more time for lead to leach.  For example, a coffee mug may be used daily to hold a hot

acidic beverage, often several times a day.  The FDA allows a
maximum of 3 parts per million for plates, saucers and other
flatware.  (http://www.fda.gov/fdac/features/1998/198_lead.html).

83.    Since 1994, the FDA has required high lead-leaching
decorative ceramic ware to be permanently labeled that it is not
for food related use and may poison food.  21 C.F.R. §
109.16(b)(1)(I).  The FDA has also banned tin-coated foil
capsules on wine bottles, after a study by the United States
Bureau of Alcohol, Tobacco and Firearms found that some of the
inspected wines had become contaminated with lead during pouring,
due to lead being deposited at the mouth of the bottle.  21
C.F.R. § 189.301.

84.    Similarly, the FDA has addressed the problem of lead
in food packaging.  According to FDA, "the use of a lead-based
printing ink on a food package causes the product to be in
violation of the Federal Food, Drug, and Cosmetic Act (many
States also have laws that are similar) if lead from the ink
contaminates or can be reasonably expected to contaminate the
food, either while it is held in the package or during the act of
eating."  FDA, Center for Food Safety and Applied Nutrition, June
13, 1995 Guidance for Industry (Lead in Candy).  In such cases,
if the product is subject to regulatory action by FDA, the agency
may prohibit its entry into the country if offered for import or,
if found within domestic commerce, may remove it from the market.
In issuing the 1995 Guidance, the FDA cited the Federal Commerce
Commission (FCC) compendium published by the Food and Nutrition

Board of the Institute of Medicine, National Academy of Sciences,
which listed a 0.5 parts per million (ppm) maximum for lead in
sucrose (sugar).  Since that Guidance, in response to the growing
awareness of lead's adverse effects at even low levels, the FCC
has lowered its specification for lead in sucrose to 0.1 ppm.
Accordingly, the FDA has now issued a revised draft Guidance to
adopt that 0.1 ppm standard.  As the agency states: "FDA is
recommending that lead levels ... not exceed 0.1 ppm because such
levels are achievable under good manufacturing practices and
would not pose a significant risk to small children for adverse
effects."  FDA, Center for Food Safety and Applied Nutrition,
December 2005 Guidance for Industry (Draft Guidance).  As to
total consumption of lead, the FDA has recommended that children
under age six *should not consume more than 6.0 ug/day of lead
from all food sources*, noting that "Lead is toxic to humans,
especially infants, young children and developing fetuses, in
both short- and long-term exposures, and can result in learning
disabilities and behavioral disorders that could last a
lifetime."  FDA Recall Press Releases, March 18, 2004, November
13, 2003.

**VII.  STATE REGULATION OF LEAD**

85.  Numerous state statutes proscribe the use of lead-
based paint on consumer products.  For example, the District of
Columbia Official Code provides that "a business entity or
individual shall not sell, offer for sale, deliver, transfer, or
possess with intent to sell, deliver, or transfer any ...

household appliance, cooking, drinking or eating utensil ... or other article intended for use by children to which a lead-based paint or glaze has been applied." D.C. Code § 8-115.03(c)

86.    In California, Proposition 65 makes it illegal to sell products containing chemicals known to cause cancer or reproductive problems without providing a warning of the health hazard to consumers. In 1987, lead was placed on the Governor's first list of chemicals known to the State to cause reproductive toxicity and requiring such a warning. The statute provides: "No person in the course of doing business shall knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving clear and reasonable warning to such individual." Violators are subject to a civil penalty of up to $2,500 per violation per day. Cal. Health and Safety Code § 25249.7(a),(d).

87.    In New York, the Commissioner of Health is charged with enforcing standards for lead in products. The New York Health Law provides that, "in the absence of a federal standard for a specific type of product, the commissioner shall establish the maximum quantity of lead or cadmium (and the manner of testing therefore) which may be released from glazed ceramic tableware, crystal, china and other consumer products. Such maximum quantity shall be based on the best available scientific data and shall insure the safety of the public by reducing its exposure to lead and cadmium to the lowest practicable level ...." NY Pub. Health Law § 1376-a.

88.    In its statute addressing "Sale of objects containing lead bearing substances," Illinois law provides that "no person shall sell or transfer or offer for sale or transfer any ... objects intended to be used ... or located in ... a residential building ... that contains a lead bearing substance and that, in the ordinary course of use, are accessible to and chewable by children."  410 Ill. Comp. Statutes § 45/5.

89.    Similarly, Massachusetts law states that "no person shall sell, expose for sale, deliver, give away or possess with intent to sell, deliver or give away any toy, furniture, cooking, drinking or eating utensil to which any lead-based paint, glaze or other substance has been applied."  Mass. Gen. Law Ann. § 196(a).

## VIII.  THE ILLEGAL PRODUCTS

90.    Relators incorporate by reference as though fully alleged  herein all of the factual information set forth in Exhibit A to the Complaint.

91.    Exhibit A identifies numerous, representative products manufactured, distributed, sold or allowed to be sold by Defendants that contain illegal quantities of lead in violation of federal and state statutes, regulations and Defendants' contractual obligations.  For each product, the Relators set forth: (a) the product's name; (b) digital photos of the product from various angles; (c) a description of the product decoration on the exterior and interior surfaces; (d) a description of the substrate, including material and color; (e) a listing and

measurement of any decoration in the "lip and rim area"; (f) the product dimensions; (g) the model or item number; (h) manufacture information, if available, including the country of origin; (i) the retail store and its address at the governmental facility where the Relators purchased the product; (j) the date of purchase; (k) the price per unit of the product; (l) the quantity of units of each product purchased; and (m) a unique evidence number code assigned by the Relators to each unit of each product purchased. Additionally, for each product, the Relators include a sales receipt depicting the date, time, location, price and quantities of purchase.

92.   After examining and purchasing over 585 suspicious products, the Relators performed preliminary swab testing to determine whether lead was present. They then eliminated products that did not test sufficiently high for lead content. Ultimately, over 175 products were sent to an independent lab for analysis. The lab utilized federally accepted testing methods to determine the extent of leachable lead. For every product, a series of tests was conducted by the lab, including (a) a digestion test, setting forth the lead measured in milligrams per kilogram (or parts per million), (b) a surface wipe test, setting forth the lead measured in micrograms per sample, and/or (c) an extraction test, setting forth the lead measured in micrograms per milliliter. For all products identified in Exhibit A, both the preliminary test performed by Relators and the lab test revealed dangerous amounts of lead. An example of the lab

testing ordered and performed for each product in Exhibit A is
set forth for one such product in Exhibit B.

## IX.  ALLEGATIONS

A.    Concessioners

93.    Relators incorporate by reference and reallege as
though fully set forth herein paragraphs 1 - 79.

94.    Defendant concessioners, such as Guest Services,
Aramark, Delaware North, and Xanterra (hereafter collectively
"Concessioners") manage and operate retail stores on federal
property.  Among other properties, Guest Services operates all
retail stores and kiosks on the National Mall, in Washington,
D.C.; the National Aquarium's retail stores; the National Park
Service, Mount Rainier Park's gift shops; the U.S. Census Bureau
Sunny Spots; the U.S. Department of the Interior's Indian Craft
Shop; and the U.S. House of Representatives Convenience Shop.  As
Guest Services proclaims, it "provides all retail management for
the congressional convenience shops serving Members of Congress,
their staff, Administration officials and tourists."
(http://www.guestservices.com/content.asp?contentid=408).
Similarly, Delaware North, through its subsidiary Delaware North
Companies Parks & Resorts, manages and operates retail facilities
on behalf of the United States in numerous locations, including
the Yosemite, Yellowstone, Grand Canyon, and Sequoia national
parks, the Tenaya Lodge, the Kennedy Space Center Visitor
Complex, the Oregon Caves National Monument, and the U.S. Mint in
Philadelphia and Denver.  Among other locations, Aramark operates

retail stores in the Denali, Mesa Verde, and Shenandoah national parks, as well as facilities in Muir Woods, Pikes Peak and Ellis Island.  On its website, Xanterra describes itself as the "country's largest park and resort management company." (http://www.xanterra.com).  It operates retail stores in, among other national parks, Mt. Rushmore, Yellowstone, Bryce Canyon and the Petrified Forest National Park.

95.    Concessioners enter into "Concessioner Contracts" with federal agencies.  For example, in March 1986, Guest Services and the United States Department of the Interior, National Park Service ("NPS") executed Contract No. CC300060002 ("the Contract"), authorizing Guest Services to manage retail stores in the National Capital Region through December 31, 2010.  For obtaining the rights to operate stores on federal land, Concessioners typically pay an annual franchise fee to the government and also pay a portion of the Concessioners' gross revenues earned under operation of the contract.  See Contract, §§ 9(a)(1),(2).

96.    In 1998, after analyzing concessioners' practices in national parks, Congress enacted the National Parks Omnibus Management Act of 1998, 16 U.S.C. §§ 5901 et seq. ("1998 Act"). In repealing a prior 1965 statute governing concessioner contracts, the 1998 Act reformed the oversight of, and responsibilities undertaken by, Concessioners on federal property.  In the new legislation, Congress clarified that its primary concern in contracting with Concessioners was not to

raise revenue, but rather to ensure that park resources were
protected and that the public was well-served.  As the Act
states, "consideration of revenue to the United States will be
subordinate to the objectives of protecting, conserving, and
preserving resources ... and of providing necessary and
appropriate visitor services to the public at reasonable rates."
16 U.S.C. § 5952(5)(a)(iv); <u>see also</u> 36 C.F.R. § 51.17(a)(5); 65
Fed. Reg. 20672 (April 17, 2000), § 51.17(a)(5).  Congress
repeated its objectives in its statement of policy:  "It is the
policy of the Congress that ... services ... shall be limited to
those ... necessary and appropriate for public use."  16 U.S.C. §
5951(b)(1).

97.  Under the 1965 statute, a Concessioner's prior
contract with NPS gave rise to a "preference" for that
Concessioner to obtain a subsequent contract for services at the
same national park.  Accordingly, "[b]ecause of this preference,
NPS estimated in 1993 that since 1965 over 99.9% of renewals of
NPS concession contracts had been awarded to the existing
concessioner."  65 Fed. Reg. 20630 (April 2000).  The 1998 Act
provides that, to obtain a preference above other bidders for a
renewal of an existing contract, concessioners will now be judged
on their past performance.  Accordingly, each concessioner must
undergo an "annual evaluation" by NPS to determine whether it has
performed satisfactory work under the contract.  36 C.F.R. §
51.44; 65 Fed. Reg. 20675 (April 17, 2000), § 51.44.  As NPS
noted, "a right of preference, which amounts to a statutory right

to have greater rights to the award of a government contract than the general public, must be earned through satisfactory performance." 65 Fed. Reg. 20646 (April 17, 2000).

98.    In annual evaluations, NPS now considers the "concessioner's performance under the terms of the applicable concession contract and other relevant facts and circumstances." 36 C.F.R. § 51.44; 65 Fed. Reg. 20675 (April 17, 2000). Indeed, the 1998 Act provides that a decision by NPS to award a new contract must be based on specific criteria. Among the most heavily weighted of the criteria are the contractor's "providing necessary and appropriate visitor services at reasonable rates," 36 C.F.R. § 51.17(a)(2), which includes the "merchandising" offered by the Concessioner. 65 Fed. Reg. 20670 (April 17, 2000).

99.    According to NPS, an offeror bidding for a contract, including an existing concessioner, "should be rated on its commitment to further the goals of the park area and to operate in a manner that is supportive of the ideals of the park. NPS considers that these interests are implicit in the established selection criteria." 65 Fed. Reg. 20640 (April 17, 2000).

100.    Even after selection of a Concessioner, the 1998 Act establishes that an awarded contract can be suspended or terminated by NPS "when necessary to achieve the purposes of the 1998 Act ... [including] ... providing necessary and appropriate visitor services in park areas." 36 C.F.R. § 51.74; 65 Fed. Reg. 20680 (April 17, 2000).

101.  In response to the 1998 Act, NPS promulgated a new
model concessioner contract.  Before doing so, NPS offered a
period of notice and comment by the public.  65 Fed. Reg. 26052
(May 4, 2000).  Fifteen public comments were received in response
to the proposed model contract, all but one from existing
concessioners or their counsel.  The comments were mostly
negative, some going so far as to suggest that "no one will
submit proposals under the terms of the new concession contract."
65 Fed. Reg. 26052 (May 4, 2000).  NPS utterly rejected that
view, because contracts allowing operations at national parks and
other federal landmarks provide substantial profits for the
concessioners.  After noting that the new concessioner contract
was appropriate in light of the 1998 Act and proper
administration of the concession program, NPS stated: "NPS also
believes that it will have no difficulty attracting qualified
businesses to submit proposals for new concession contracts.  NPS
concession businesses are profitable and enjoyable."  Id.

102.  Several commenters objected to the special provisions
contained in the new concessioner contract that NPS determined
were necessary to "give NPS the ability to properly preserve and
protect ... the national park system and their visitors."  NPS
concluded:  "These [special provisions] include the ability to
describe and modify the nature of concessioners' operations ...
and the ability to terminate the contract when necessary for
resource and visitor protection.  NPS appreciates that these
types of authorities are not typical in commercial leasing or

contracting arrangements.  However, they are essential to
achieving the NPS mission of protecting and preserving park areas
and their visitors."  65 Fed. Reg. 26052 (May 4, 2000).

103.  After reviewing and analyzing the public comments, NPS
published a new model concessioner contract to "conform to the
requirements of the 1998 Act."  65 Fed. Reg. 26052 (May 4, 2000).
Despite "new" contract provisions arising from the 1998 Act
requirements, Congress stated that "the provisions of [the 1998
Act] shall apply to any [existing] contract or permit except to
the extent such provisions are inconsistent with the terms and
conditions of any such contract or permit."  16 U.S.C. § 20 note;
Pub L. 105-391, Title IV § 415(a), 112 Stat 3515 (1998).

104.  Among other requirements, the new model contract
provides that:

(a)   the Concessioner "must comply with all Applicable Laws
in fulfilling its obligations under this CONTRACT," including
"federal, state and local laws, rules, regulations, requirements
and policies governing ... protection of the environment and
protection of public health and safety."  65 Fed. Reg. 26065 (May
4, 2000), § 5(a); 65 Fed. Reg. 26063 (May 4, 2000), § 2(a); and

(b)   the Concessioner must comply with "Environmental
Management Objectives" in the conduct of its operations under the
concessioner contract (65 Fed. Reg. 26065 (May 4, 2000), § 6(a)),
which are:

(1)   "The Concessioner, including its employees, agents and
contractors, shall comply with all Applicable Laws pertaining to

the protection of human health and the environment."  65 Fed.
Reg. 26065 (May 4, 2000), § 6(a)(1); and

(2)    "The Concessioner shall incorporate Best Management
Practices (BMPs) in its operation ... acquisition, provision of
visitor services, and other activities under this CONTRACT."
Best Management Practices "are policies and practices that apply
the most current and advanced means and technologies available to
the Concessioner to undertake and maintain a superior level of
environmental performance reasonable in light of the
circumstances of the operations conducted under this CONTRACT."
65 Fed. Reg. 26065 (May 4, 2000), § 6(a)(2); 65 Fed. Reg. 26063
(May 4, 2000), § 2(c).

105.  Significantly, to further implement the Congressional
goals in the 1998 Act of providing a safe and secure environment
for the public, the model contract also provides that:

(a)    the Concessioner "shall develop, document, implement,
and comply fully with" a comprehensive written Environmental
Management Program (EMP), updated and submitted annually by the
Concessioner, to achieve the Environmental Management Objectives.
65 Fed. Reg. 26065 (May 4, 2000), § 6(b)(1).  The EMP "shall
account for all activities with potential environmental impacts
conducted by the Concessioner or to which the Concessioner
contributes."  65 Fed. Reg. 26065 (May 4, 2000), § 6(b)(1),(2);

(b)    the EMP "shall describe how the Concessioner will
comply with the EMP and how the Concessioner will self-assess its
performance under the EMP, at least annually."  The self-

assessment "should ensure the Concessioner's performance with the Environmental Management Objectives," "measure performance against environmental goals and targets," and "also describe procedures to be taken by the Concessioner to correct any deficiencies identified by the self-assessment."  65 Fed. Reg. 26066 (May 4, 2000), § 6(b)(3)(ix); and

(c)    in addition to the Concessioner's self-assessment, the Concessioner "shall be evaluated by the Director on its environmental performance under this CONTRACT, including, without limitation, compliance with the approved EMP, on at least an annual basis."  65 Fed. Reg. 26066 (May 4, 2000), § 6(c).

106.  Finally, the contract provides that: "The Concessioner shall give the Director immediate notice of any violation of Applicable Laws by the Concessioner, including its employees, agents or contractors, and, at its sole cost and expense, must promptly rectify any such violation."  65 Fed. Reg. 26065 (May 4, 2000), § 5(b).

107.  The Guest Services 1986 Contract identified above has terms consistent with the model requirements.  For example, it requires the Concessioner throughout the term of the Contract to provide services for the public, including merchandise, souvenirs and other retail sales at the designated area covered by the Contract.  Contract, § 2(a).  It also states that the Concessioner's operation under the Contract "shall be subject to the laws of Congress governing the area, and the rules, regulations and policies promulgated thereunder, whether now in

force or hereafter enacted or promulgated...." Contract, § 2(b).
Finally, the Contract provides that NPS may terminate the
contract in whole or in part when necessary for the protection of
visitors, and may similarly suspend operations of the
Concessioner, at NPS' discretion, when necessary to protect the
health and safety of visitors and employees. Contract, § 11(a).
When NPS deems it necessary to suspend operations of the
concessioner to protect visitors, NPS "shall not be liable for
any compensation to the Concessioner for losses occasioned
thereby." Contract, § 11(b).

108. In selling defective products with dangerous and
illegal quantities of lead, Concessioners knowingly violated
federal law, regulatory requirements, and contractual
obligations, as set forth above, in including, but not limited
to, the following:

a) Concessioners and their employees, agents and
contractors failed to comply with federal Applicable Laws
pertaining to the protection of human health and the environment,
including the Federal Hazardous Substances Act;

b) Concessioners failed to comply fully with EMP
requirements, including failing to perform annual self-assessment
of their environmental practices, which would have disclosed
their employees', agents', and contractors' illegal sale of
defective and dangerous products;

c) Concessioners failed to incorporate BMP in its testing
and purchases of products, which would have disclosed the

dangerous and illegal quantities of lead before resale of the products to park visitors; and

d)     Upon realization of their sale of dangerous and illegal products to the public, Concessioners failed to give immediate notice to NPS of their conduct, instead taking measures to disguise such prior sales.

109.  As a result of Concessioners' knowingly false express and implied certifications and representations to NPS of compliance with statutory, regulatory and contractual requirements in annual reports and assessments, as well as such false certifications and representations in bids for renewals and subsequent contracts, NPS did not take action to terminate or suspend operations of Concessioners' retail sales of defective products.  Concessioners fraudulent conduct, from at least 1996 to the present, and its failure to disclose such conduct to NPS, allowed Concessioners to:

(a)     submit and win bids for contracts which they otherwise would not have been awarded;

(b)     continue to make, at high profit, illegal and dangerous sales of defective products to government employees and the unsuspecting public; and

(c)     pay smaller annual franchise fees and gross revenue percentages to NPS than they otherwise would have been required to pay.

110.  Many of the products offered for sale by Concessioners at national parks and other government locations contain United

States' emblems or other national insignias, such as agency
logos, seals, and other identifying markings.  Upon information
and belief, Concessioners knowingly purchased and re-sold to
government employees and the public products, including those
manufactured overseas, in which the manufacturers or vendors of
the products failed to obtain appropriate agency authorization
for use of such emblems, insignias and logos.

111.  The government requires vendors wishing to sell
products bearing official government seals and logos to follow
federal law to obtain permission for such use.  Each agency has
promulgated regulations specifying how such permission may be
obtained, and the  United States Code provides for criminal
sanctions (fines and imprisonment for not more than six months)
for use of official insignias other than through agency
authorization.  18 U.S.C. § 701.  For example, the National
Archives and Records Administration (NARA) requires a written
request for use of the agency's seal.  NARA must specifically
approve how the seal or logo will be displayed, including
requiring the applicant to submit "a sample" of the "material on
which the seal(s) or logo(s) would appear."  36 C.F.R. §
1200.8(a)(2).  Under "criteria for approval," the regulations
specify that seals or logos will not be used on any article or in
any manner that reflects unfavorably on NARA."  36 C.F.R. §
1200.10(b).

112.  Upon information and belief, by failing to obtain
agency approval for the sale of their defective products bearing

the agencies' seals or logos, Defendants deprived the agencies of the opportunity to inspect and examine the products and determine their fitness for sale.  By otherwise selling the products to the government, and by offering the products for sale to the public in government facilities, Defendants knowingly and falsely certified,  expressly or impliedly, that the products had undergone such official agency inspection, examination and approval.

      B.    <u>Manufacturers, Distributors and Vendors</u>

     113.  Relators incorporate by reference and reallege as though fully set forth herein paragraphs 1 - 79.

     114.  Numerous Defendants identified herein sold dangerous and defective products containing lead to the United States government (and directly to government employees), either directly as a manufacturer or vendor, or through other Defendants acting as distributors or middlemen (hereafter, for this Section IX(B) only, this subset of Defendants are collectively referred to as "the direct-sale Defendants").  In addition to violation of the provisions contained in their contracts, purchase orders and invoices that apply to such sales, various other express and implied warranties were knowingly violated by the direct-sale Defendants.  In performing the acts alleged herein, including selling the products described in the Complaint, Defendants knowingly violated terms of their agreements with the government. In doing so, as well as in their other conduct, these Defendants violated the False Claims Act.

1. <u>Express Warranties</u>

a. *Products Sold on Military Bases, Military Museums and On-Line Shopping Sites*

115.  Vendors generally sell products to the United States military through contracts, purchase orders or invoices.  Upon information and belief, the provisions set forth in the Army & Air Force Exchange Service ("AAFES") Retail Agreement, revised in February 2003 ("AAFES Retail Agreement") and AAFES Supplier Requirements, Agreement 03-01 (January 2003) ("AAFES Supplier Requirements") concerning products obtained for sale through purchase orders with vendors, are typical of the requirements imposed upon vendors who sell products to the military.  Among other specifications, the terms and conditions of the AAFES Retail Agreement and Supplier Requirements provide:

(a)  "DISPUTES - Submission of false claims to AAFES is a violation of federal law and may result in civil and/or criminal penalties."  AAFES Retail Agreement, Section 1 (a).

(b)  "INDEMNIFY AND HOLD HARMLESS - The contractor will indemnify, hold harmless AAFES and all other United States agencies and instrumentalities, their agents, representatives, employees and customers from any and all suits, judgments and claims, including those established by or pursuant to court decisions, international agreements, or duly promulgated United States government regulations and all charges and expenses incident thereto which arise out of the following.

. . .

(2)    The loss, damage or injury alleged or established to have arisen out of or in connection with items or services provided by contractor, to the extent contractor can be held liable for such loss, damage, or injury in accordance with applicable federal and state law." AAFES Retail Agreement, Section 6(a)(2).

(c)    "CONFORMANCE WITH APPLICABLE LAWS AND REGULATIONS - By supplying merchandise to AAFES, vendor warrants that it has complied with all applicable laws and regulations governing the manufacture, sale, packing, shipment and delivery of the merchandise." AAFES Retail Agreement, Section 24.

(d)    "INSPECTION/QUALITY ASSURANCE - Items furnished under this contract are subject to inspection and test at all reasonable times, to include verification inspections, and at all reasonable places including but not limited to the manufacturing or assembly plant, shipping point, depot, and the using or selling activity." AAFES Supplier Requirements, Section 2(c).

(e)    "HEAVY METAL LEACHING -

(1)    Contractor warrants that any product furnished under this contract that can reasonably be used to carry food or liquid for human consumption and made of a substance prone to heavy metal leaching, such as pewterware, earthenware, ceramicware, chinaware, ironware, lacquerware, bronzeware, brassware, leaded crystalware, and coated/plated items with a heavy metal base, contains no leachable levels of metals dangerous to users.

Maximum leachable levels and test methods are established by the U.S. Food and Drug Administration.

(2)     AAFES reserves the right to test the contractor's products on an unannounced basis.  If a heavy metal leaching failure is found, contractor agrees to reimburse AAFES for all follow up costs to sample test the remainder of the items ordered. ...  Contractor further warrants that products have been tested by either the U.S. Food and Drug Administration or a nationally recognized, independent test laboratory and found to be in compliance with the current U.S. Food and Drug Administration action levels and test methods."  AAFES Supplier Requirements, Section 2(i)(1).

(f)     "INSIGNIA - Contractor warrants that they have a certificate of authority from the DEPARTMENT OF THE ARMY or the DEPARTMENT OF THE AIR FORCE to manufacture the items ordered, or that they will supply only such products of a manufacturer who has such certificate(s)."  AFFES Supplier Requirements, Section 11(A), UO2.

(g)     "CONTRACTOR LIABILITY (MAR 94).  In addition to the liabilities specifically provided for in other clauses, contractor will be liable as follows in the event contractor fails to fully and timely perform in accordance with all contract provisions:

     a.   Incidental damages, including expenses reasonably incurred in inspection, receipt, packing, rejection or screening of goods in lieu of rejection, care and custody of goods

48

rightfully rejected, transportation, and any other reasonable expense incident to contractor's failure to fully and timely perform in accordance with all contract provisions." AAFES Supplier Requirements, Section 5(a).

(h) "WARRANTY (DEC 91). Contractor warrants that: The items furnished will be merchantable and fit and sufficient for the use intended." AAFES Supplier Requirements, Section 1(a).

116. The Marine Corps Community Services ("MCCS") operates Marine Corps Exchanges (MCX) throughout the United States and overseas. The MCCS and Exchanges "are an instrumentality of the United States government performing government functions and their contracts are United States contracts." Tax Exempt Certificate, 9/25/05. All tangible and personal property and services purchased pursuant to a written contract or agreement by the MCX are either for resale or consumption by the Exchanges. Id.

117. The provisions in the MCX Business Conditions, concerning products obtained through purchase orders with vendors, set forth similar requirements of manufacturers and sellers as those discussed above, and also contain the following terms and conditions:

(a) "LOGO MERCHANDISE. Manufacturers desiring to use the Marine Corps emblem on merchandise for commercial resale must submit a pre-production sample of the product for approval." MCX Business Conditions, Section 5, Paragraph 5.

(b)    "WARRANTY.  Contractor warrants that:  The items furnished will be merchantable and fit and sufficient for the use intended.  ...  This warranty will survive MCX acceptance of the items and is in addition to other warranties of additional scope given to MCX by the contractor.  Any warranty given by the contractor will be at least as good as the warranty offered to other agencies and instrumentalities of the United States."  MCX Business Conditions, Section 5, Paragraph 18(a).

(c)  "The items or service furnished are covered by the most favorable warranties the contractor gives to any customer for such items or services...."  MCX Business Conditions, Section 5, Paragraph 18(b).

(d)  "INSPECTION/QUALITY ASSURANCE.

a.    Contractor will maintain an in-process and end-item quality control program to ensure MCX shipments do not include defective/nonconforming items.

. . .

c.    If the items purchased are defective/nonconforming, the contacting officer may ... revoke acceptance ..."  MCX Business Conditions, Section 5, Paragraph 20(a), (c).

(e)  "CONFORMANCE WITH APPLICABLE LAWS AND REGULATIONS.  By supplying merchandise to MCX, vendor warrants that it has complied with all applicable laws and regulations governing the manufacture, sale, packing, shipment, and delivery of the merchandise."  MCX Business Conditions, Section 5, Paragraph 33.

b.   *Products Sold at National Landmarks and Other Federal Facilities*

118.   Non-military vendors also generally sell products to the United States through contracts, purchase orders or invoices. Upon information and belief, the provisions set forth in the Smithsonian Institution's Terms and Conditions, concerning products obtained for sale in its museum stores through purchase orders with vendors, are typical of the requirements imposed upon such vendors.  Among other specifications, those terms and conditions provide:

(a)   "GUARANTEE OF COMPLIANCE WITH LAW - Vendor ... guarantees that no applicable Federal, State or Local law prohibits the shipment, offering for sale, sale, or use for the purpose intended of merchandise covered by this order."

(b)   "BREACH OF WARRANTY OR GUARANTEE - in the event any merchandise covered in this purchase order, in whole or in part, including packaging, labels or labeling, is determined by Museum stores in its good faith discretion to be of inferior quality or workmanship, or not in conformity with the terms, specifications or requirements of this order, vendor shall at the written request of Museum stores give Museum stores full credit for any merchandise  returned (or if requested, cash for such items of merchandise) plus transportation charges back to the vendor. Neither payment of invoices nor delayed return of merchandise shall constitute acceptance of merchandise to be deemed a waiver of Museum stores rights to return merchandise."

(c)    "PRODUCT LIABILITY: The vendor agrees to defend, save and hold harmless the Smithsonian Institution from all damages and injuries which arise or allege to arise out of the manufacture, distribution, and sale of the Vendor's products."

(d)    "Museum stores agree to purchase the merchandise covered by this order only on the basis of the terms and conditions stated herein."

119.    In performing the acts alleged herein, including selling the products described in the Complaint, the direct-sale Defendants knowingly violated express terms of their contracts, purchase orders, and invoices which were designed to protect the government and consumers.  They also violated implied warranties as set forth, below.

    2.    Implied Warranties

120.    The Uniform Commercial Code (UCC) applies to goods purchased by the United States.  See, e.g., United States v. Hext, 444 F.2d 804 (5th Cir. 1971); Everett Plywood & Door Corp. V. United States, 419 F.2d 425 (Ct. Cl. 1969); United States v. Wegematic Corp., 360 F.2d 674 (2d Cir. 1966).  As such, the government is entitled to the benefits of its implied warranty provisions.

121.    UCC § 2-314(a) establishes that an implied warranty of merchantability exists with every sale of goods.  The goods must: meet the contract description according to the usual standards of the trade; be of fair or average quality; be fit for the "ordinary purposes" of the goods; run of even quality within the

normal range of variation; be adequately contained, packaged and labeled; and conform to any promises of fact made on their container or label.  UCC § 2-314(b).

122.  The UCC also establishes an implied warranty of fitness for a particular purpose.  The section states: "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is . . . an implied warranty that the goods shall be fit for such purpose."  UCC § 2-315.

123.  Federal Acquisition Regulations (FARs) also prescribe the procedures for the warranties, inspections and quality assurances that are required in government procurement contracts. The products at issue in the Complaint are designated as "commercial items" under FAR 2.101.  That provision defines commercial items as: "(1) Any item, other than real property, that is of a type customarily used by the general public or by non-governmental entities for purposes other than governmental purposes, and (i) has been sold, leased, or licensed to the general public; or (ii) has been offered for sale, lease, or license to the general public."  FAR 2.101(1).

124.  With some exceptions, FAR 12 establishes the policies and procedures applicable to the purchase of commercial items by the federal government.  FAR 12.301(b)(3) instructs contracting officers to insert FAR 52.212-4 into their contracts.  FAR 52.212-4  states that both express and implied warranties of

fitness and merchantability are applicable to the contract.  FAR
52.212-4(o).  It further instructs governmental entities to
insert into contracts for commercial items the requirement that
"[t]he Contractor shall comply with all applicable Federal, State
and local laws, executive orders, rules and regulations
applicable to its performance under [the] contract."  FAR
52.212(q).

125.  While contracting officers may alter specific
warranties, they are directed to retain express and implied
warranties of fitness and merchantability.  FAR 12.404.  FAR
12.404(a) directs contracting officers on the appropriate
standards for modifying warranties; it expressly provides that
the implied warranty of merchantability and the implied warranty
of fitness for a particular purpose are provisions that should be
included in each federal contract for the acquisition of
commercial items.  Moreover, FAR 12.404(b) directs that express
warranties should be utilized when customary to commercial trade.
Even when utilizing express warranties, the implied warranties
should only be limited or waived if the express warranty provides
for the government's recovery for items discovered to be
defective after acceptance of the items.

126.  FAR 46 sets out the inspection, quality assurance, and
warranty provisions required in government contracts, and
specifically addresses the requirements for commercial goods.  It
states that a commercial goods contractor's existing quality
assurance program operates as a substitute for government

inspection unless customary practice in the non-governmental market is different.  FAR 46.102(f).  This determination is reiterated in FAR 46.202-1.

127.  Upon information and belief, through their sales of dangerous and defective products containing illegal quantities of lead, and their knowing failure to disclose the dangerous and illegal nature of such products, the direct-sale Defendants have knowingly violated various contract, purchase order, and invoice provisions applicable to their sale of such products to the United States.  In addition, through such conduct, the direct-sale Defendants have knowingly violated express and implied warranty provisions, as well as inspection and quality assurance provisions, set forth in the UCC and FARs.

128.  Many of the products sold to the United States by such Defendants contain United States' emblems or other national insignias, such as military and agency logos, seals, and other identifying markings.  Upon information and belief, the direct-sale Defendants knowingly sold products, including those manufactured overseas, in which the manufacturers or vendors of the products failed to obtain appropriate agency authorization for use of such emblems, insignias and logos (see paragraphs 111-112, above).

129.  Upon information and belief, by failing to obtain formal agency approval for the sale of their defective products bearing the agencies' insignias, seals or logos, the direct-sale Defendants deprived the agencies of the opportunity to inspect

and examine the products and determine their fitness for sale.
By otherwise selling the products to the government, these
Defendants knowingly and falsely certified, either expressly or
impliedly, that the products

had undergone such official agency inspection, examination and
approval.

**X.    DEFENDANTS' KNOWLEDGE**

130.  The danger of lead in consumer products -- especially
products designed to be placed in a consumer's mouth -- has been
well-known for years.  Upon information and belief, Defendants
were at all times relevant to the Complaint, and continue to be,
clearly aware of the dangers inherent in manufacturing, selling,
distributing and offering for sale products that contain lead
paint.  Moreover, Defendants were at all times relevant to the
Complaint, and continue to be, aware that their defective
products contain large and illegal quantities of lead.

A.    The Society of Glass and Ceramic Decorators

131.  For example, the Society of Class and Ceramic
Decorators (SGCD) issued a report in February 2003, Tenth
Edition, written by General Counsel James A. Calderwood, entitled
"Lead and Other Heavy Metals: Where Does the Decorating Industry
Stand?" ("Report").  The report provides extensive information
about the legal requirements pertaining to lead and available lab
testing to ensure compliance.  Among other things, the
publication states:

A.    "Our purpose here is to provide, in a concise and understandable manner, the current status of various laws and regulations concerning heavy metals such as lead, that impact upon decorated glass and ceramic ware."  Report, at 1.

B.    "We present here only a brief overview; this cannot substitute for individual legal advice concerning particular situations relating to decorated items and methods."  Report, at 1.

C.    "The Society of Glass and Ceramic Decorators (SGCD) promotes the production of products that are safe for people to use and that will reduce environmental degradation."  Report, at 1.

D.    "Many important advances are being made in the decorating industry to reduce and limit the use of heavy metals. For example, color manufacturers, working closely with decorators, have made significant progress in developing unleaded and low-lead systems.  There now are several lines of unleaded colors on the market, although not all colors in the spectrum are as yet available.  Even those colors with lead contain less lead than they did in the past."  Report, at 1-2.

E.    "We actively encourage our members to follow all the laws and applicable standards.  Of course, we cannot guarantee particular products.  Most reputable decorators have made a personal or corporate commitment to the quality of what they produce."  Report, at 2.

F.    "As many consumers have recognized, a ceramic mug, dinner plate or glass tumbler used for food or beverages such as coffee, milk, and soft drinks, can be reused thousands of times over a number of years."  Report, at 13.

G.    "We actively encourage compliance among all segments of the industry. ... SGCD has worked with the FDA and other federal agencies, as well as with state governments and Congress, to develop responsible standards.  SGCD sponsors conferences and seminars that deal with environmental/health/safety matters. Through our Newsletter and other publications, we keep our members informed on the latest developments.  What can those who produce decorated ware or are the professionals who commercially purchase it do to help insure that the products are safe for use? We offer the following suggestions:

1.    Follow the standards of FDA and certain states as indicated in this paper.

2.    Establish a program of testing that will provide information to customers, on request.

3.    Use unleaded colors, where possible.  The unleaded palette is slightly subdued, less brilliant than lead-bearing colors.  However, lead-free techniques are rapidly improving and multiplying.

4.    Belong to recognized professional organizations such as SGCD that monitor these issues and keep you informed.

5.    Attend professional programs reporting on health and safety developments, uses of materials and equipment and new products."  Report, at 13-14.

B.    <u>The Coalition of Safe Ceramicware, Inc.</u>

132.  In addition to the SGCD, the Coalition of Safe Ceramicware, Inc. ("CSC") is another trade association that describes its membership as "compris[ing] the majority of the world's leading manufacturers and distributors of ceramic ... tableware."  April 4, 2003 letter of Counsel Michael Kershow to U.S. Food and Drug Administration ("2003 letter"), at 1.  The CSC was founded in 1989 "in direct response to the ... FDA's concerns about the use of lead as a component of ceramic glazes and decorations."  May 14, 2004 letter of Counsel Michael Kershow to the Commission for Environmental Cooperation ("2004 letter"), at 1.

133.  After attempting to address the FDA's concerns about lead in ceramic products, the CSC "embarked upon a number of initiatives designed to limit leachable lead levels in its members' products," including "adoption of a quality assurance program to ensure members' consistent compliance with the reduced regulatory limits on leachable lead in ceramicware issued by the agency in 1992 and the joint promulgation (with the Society of Glass and Ceramic Decorators) of a voluntary standard for leachable lead in external decorations in the "lip-rim" area (i.e, top 20 mm) of the external surface of glass and ceramic drinking vessels."  2004 letter, at 1.

134.  The CSC "support[s] appropriate FDA oversight over the safety of their ... products." 2003 letter, at 3.  Indeed, it recognizes "that FDA properly has the authority to take enforcement action under the FD&C Act in those cases where it deems leachable lead levels in ceramic or crystal tableware to constitute a threat to public health."  Id.

135.  The CSC "certainly shares the ... objective of reducing the exposure of persons - particularly, children - in the United States, Canada and Mexico to toxic chemicals such as lead." 2004 letter, at 2.  Indeed, the trade association claims that, since its founding and through its educational efforts such as workshops and advocacy, responsible members of its industry have moved away from use of lead in ceramics to comply with FDA concerns.  Id. at 1-2.

It states:

> The use of unleaded glazes is now common throughout the
> industry.  Unleaded color systems are also increasingly
> being used, although unleaded formulations are not yet
> available for the entire color palette in all product
> applications.  But across the board, even where lead is
> still being employed in particular products, improved
> quality assurance systems have led to substantial
> reductions in the amounts of leachable lead - that is,
> the quantity of lead that can migrate from the glaze or
> pigment into foods - in CSC members' products.  As a
> result, leachable lead values in ceramic tableware are
> today only a fraction of the levels that prevailed 15
> years ago.

2004 Letter, at 2.  Ultimately, it concludes that "its members have dramatically reduced the levels of leachable lead in the products."  Id.

136.  For all times applicable to the complaint, through education, advocacy and other industry and trade association efforts, the dangers of lead in ceramic and glassware were well known to those who manufactured, distributed and sold such products.  The Defendants in this case knowingly and intentionally ignored those dangers to sell and distribute defective products to the government and consumers.

C.    Consent Judgments

137.  Moreover, on and after the times set forth below, some Defendants knew of concerns that their specific glassware and ceramics products contained illegal quantities of lead.  The Defendants settled civil claims in California arising from their sale of such products, and entered into consent judgments through which they agreed to: (1) pay civil penalties, and (2) reformulate their products to eliminate dangerous levels of lead. Each consent judgment expressly provides the "reformulation standards" establishing the maximum levels of lead permitted in consumer products sold by Defendants in California.  The judgment also sets forth the dates by which the Defendants were required to comply with the reformulation.

138.  On August 5, 2005, Anheuser-Busch Incorporated received notice from Relator Russell Brimer that its sale of consumer products with high quantities of lead violated California law.  Anheuser-Busch Incorporated is a subsidiary of defendant Anheuser-Busch.  The consumer products identified in the notice were ceramic mugs and other ceramic ware.

139.  On March 31, 2005, Evergreen Enterprises received notice from Relator Russell Brimer that its sale of consumer products with high quantities of lead violated California law. Following discovery, the disclosure of evidence and subsequent negotiation, Evergreen Enterprises agreed to terms of a consent judgment on September 4, 2005, regarding its sale of ceramic ware and glassware products used for the consumption of food and beverages.  As part of the consent judgment, Evergreen Enterprises agreed to pay $45,000 in civil penalties. Additionally, the consent judgment requires Evergreen Enterprises to meet strict reformulation standards.  If 100% of the products sold by Evergreen Enterprises in California in 2006 meet the following standards, $30,000 of the civil penalties would be waived.  A product subject to the consent judgment must not contain materials used for decorative artwork or designs on the exterior of the product that contain more than 0.06% lead by weight (0.02% if the material is used in the lip and rim area) or 0.99 ppm for a ceramic product if the C927 test method is utilized (0.5 ug if the material is used in the lip and rim area); or the colored artwork or designs on the exterior surface of the product may not contain more than 1.0 ug of lead total. If a product is marketed towards children, no materials containing more than 0.06% lead by weight may be used on exterior surfaces of the product.  For a product not used for the consumption of food or beverages, there must be less than a total of 4.0 ug of lead on all decorated surfaces.  Evergreen

Enterprises was required to meet these standards by December 31, 2005.

140.    On April 25, 2003, Gibson Overseas received notice from Relator Dr. Leeman that its sale of consumer products with high quantities of lead violated California law.  Following discovery, the disclosure of evidence and subsequent negotiation, Gibson Overseas agreed to the terms of a consent judgment in or around May 2004, regarding its sale of glassware products used in the consumption of food and beverages with colored designs on the exterior.  As part of the consent judgment, the company agreed to pay a portion of $300,000 in civil penalties.  Additionally, the consent judgment requires Gibson Overseas to meet strict reformulation standards.  A product subject to the consent judgment manufactured between June 30, 2004, and December 31, 2004, must not use materials containing more than 0.06% lead by weight, or achieve a test result of less than 1.75 ppm lead total.  Products manufactured between January 1, 2005 and December 31, 2007 must not contain materials that contain more than 0.06% lead by weight or must achieve a test result of less than 1.5 ppm lead total.  Products manufactured after December 31, 2004, containing a new design must not use any decorating materials containing 0.06% lead by weight, with limited exceptions.  No materials containing more than 0.06% lead by weight may be used on a product that is marketed towards children and manufactured after October 31, 2004.  All products manufactured after December 31, 2007, are not permitted to use

materials containing more than 0.06% lead by weight with limited exception. Additionally, all products with designs in the lip and rim area manufactured after May 10, 2004, shall not have lead detectable above 0.02% by weight, and shall not use material with more than 0.06% lead by weight if manufactured after December 31, 2004.

141. On February 13, 2006, Heineken received notice from Relator Russell Brimer that its sale of consumer products with high quantities of lead violated California law. Following discovery, the disclosure of evidence and subsequent negotiation, Heineken agreed to the terms of a consent judgment on March 31, 2006, regarding its sale of ceramic ware and glassware products used for the consumption of food and beverages and other uses that contain lead. As part of the consent judgment, the company agreed to pay $22,500 in civil penalties. Additionally, the consent judgment requires Heineken to meet strict reformulation standards. A product subject to the consent judgment used for the consumption of food and beverages must not contain materials used for decorative artwork or designs on the exterior of the product that contain more than 0.06% lead by weight (0.02% if the material is used in the lip and rim area) or 0.99 ppm for a ceramic product if the C927 test method is utilized (0.5 ug if the material is used in the lip and rim area); or the colored artwork or designs on the exterior surface of a product may not produce a test result of more than 1.0 ug of lead total. If a product is marketed towards children, no materials containing

more than 0.06% lead by weight may be used on exterior surfaces of the product.  For a product not used for the consumption of food or beverages, there must be less than a total of 4.0 ug of lead on all decorated surfaces.  Heineken is required to meet these standards for 80% of the covered products by December 31, 2006, and 100% of the products by January 1, 2007.

142.  On October 18, 2004, K&M/Nordic received notice from Relator Russell Brimer that its sale of consumer products with high quantities of lead violated California law.  Following discovery, the disclosure of evidence and subsequent negotiation, K&M/Nordic agreed to the terms of a consent judgment on April 27, 2005, regarding its sale of ceramic and glass beverageware with colored artwork on the exterior of the products.  As part of the consent judgment, K&M/Nordic agreed to pay $9,000 in civil penalties.  Additionally, the consent judgment requires the company to meet strict reformulation standards.  A product subject to the consent judgment must not contain materials used for decorative artwork or designs on the exterior of the product that contain more than 0.06% lead by weight or if the artwork does not extend into the top 20 mm of the products, it must not produce a test result of more than 1.0 ug of lead.  K&M/Nordic was required to meet these standards for covered products sold in California by December 31, 2005, with limited exception.

143.  On September 3, 2004, Russ Berrie received notice from Relator Dr. Leeman that its sale of consumer products with high quantities of lead violated California law.  Following discovery,

the disclosure of evidence and subsequent negotiation, Russ
Berrie agreed to the terms of a consent judgment on June 1, 2005,
regarding its sale of mugs and other ceramic tableware with
designs on the exterior that contain lead.  As part of the
consent judgment, Russ Berrie agreed to pay $20,000 in civil
penalties.  Additionally, the consent judgment requires the
company to meet strict reformulation standards.  A product used
for the consumption of food or beverage subject to the consent
judgment must not contain materials used for decorative artwork
or designs on the exterior of the product that contain more than
0.06% lead by weight (0.02% if the material is used in the lip
and rim area) or 0.99 ppm if the C927 test method is utilized
(0.5 ug if the material is used in the lip and rim area); or the
colored artwork or designs on the exterior surface of a product
may not contain more than 1.0 ug of lead total.  If a product is
marketed towards children, no materials containing more than
0.06% lead by weight may be used on exterior surface of the
product.  For products not used for the consumption of food or
beverages, other than those marketed towards children, there must
be less than a 4.0 ug of lead total on all decorated surfaces.
Russ Berrie is required to meet these reformulation standards for
80% of the products by December 31, 2006, and for 100% of the
products by January 1, 2007.

144.  On July 30, 2004, Smith News received notice from
Relator Russell Brimer that its sale of consumer products with
high quantities of lead violated California law.  Following

discovery, the disclosure of evidence and subsequent negotiation, Smith News agreed to the terms of a consent judgment on April 4, 2005, regarding its sale of ceramic ware and glassware products used for the consumption of food and beverages that contain lead. As part of the consent judgment, Smith News agreed to pay up to $100,400 in civil penalties.  Additionally, the consent judgment requires Smith News to meet strict reformulation standards.  A product subject to the consent judgment must not contain materials used for decorative artwork or designs on the exterior of the product that contain more than 0.06% lead by weight; or the colored artwork or designs on the exterior surface of the product may not leach more than 1.0 ug of total lead so long as the artwork or designs do not extend into the lip or rim area. Smith News also committed to conform as many of the products as commercially reasonable to the reformulation standards.

145.  On October 4, 2005, Smith-Western agreed to the terms of a consent judgment regarding its sale in California of ceramic ware and glassware products containing lead.  As part of the consent judgment, Smith-Western agreed to pay up to $22,500 in civil penalties.  Additionally, the consent judgment requires Smith-Western to meet strict reformulation standards.  A product subject to the consent judgment used for the consumption of food and beverages: (1) must not contain materials used for decorative artwork or designs on the exterior of the product that contain more than (a) 0.06% lead by weight (0.02% if the material is used in the lip and rim area) or (b) 0.99 ppm for a ceramic product if

the C927 test method is utilized (0.5 ug/ml if the material is
used in the lip and rim area); or (2) the colored artwork or
designs on the exterior surface of a product must not produce a
test result higher than 1.0 ug of lead applied on the decorated
portions of the exterior surface as outlined in NIOSH method no.
9100.  If a product is marketed towards children, no materials
containing more than 0.06% lead by weight may be used on exterior
surfaces of the product.  For a product not used for the
consumption of food or beverages, there must be less than 4.0 ug
of total lead on all decorated surfaces.  Smith-Western is
required to meet these reformulation standards for 80% of the
products by December 31, 2006, and for 100% of the products by
January 1, 2007.

        146.  On February 14, 2005, Boelter received notice from
Relator Russell Brimer that its sale of consumer products with
high quantities of lead violated California law.  Following
discovery, the disclosure of evidence and subsequent negotiation,
Boelter agreed to the terms of a consent judgment on August 10,
2005, regarding its sale of ceramic ware and glassware products
used for the consumption of food and beverages, or other
purposes, that contain lead.  As part of the consent judgment,
Boelter agreed to pay $21,000 in civil penalties.  Additionally,
the consent judgment requires Boelter to meet strict
reformulation standards.  A product subject to the consent
judgment used for the consumption of food and beverages must not
contain materials used for decorative artwork or designs on the

exterior of the product that contain more than 0.06% lead by
weight (0.02% if the material is used in the lip and rim area) or
0.99 ppm for a ceramic product if the C927 test method is
utilized (0.5 ug if the material is used in the lip and rim
area); or the colored artwork or designs on the exterior surface
of a product may not produce a test result of more than 1.0 ug of
lead total.  If a product is marketed towards children, no
materials containing more than 0.06% lead by weight may be used
on exterior surfaces of the product.  For a product not used for
the consumption of food or beverages, there must be less than a
total of 4.0 ug of lead on all decorated surfaces.  Boelter is
required to meet these standards for 80% of the covered products
by December 31, 2006, and 100% of the products by January 1,
2007.

**XI.  DAMAGES**

147.  Because the details of each and every false and
fraudulent claim made to the United States as a result of the
above allegations are more particularly within the Defendants'
knowledge, the governments' actual damages are not specifically
known at the present time.  Relators, however, estimate that the
total liability of the Defendants amounts to millions of dollars.

### Count I

### False Claims Act 31 U.S.C. § 3729(a)(1) and (a)(2)

148.  Relators repeat and reallege each and every allegation
contained in paragraphs 1 through 124 above as though fully set
forth herein.

149.  This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 et seq., as amended.

150.  Through the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States, within the meaning of 31 U.S.C. § 3729(a)(1).

151.  Through the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted material facts, to get false and fraudulent claims paid or approved, within the meaning of 31 U.S.C. § 3729(a)(2).

152.  The United States, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, paid and continues to pay claims that would not be paid but for Defendants' unlawful conduct.

153.  As a result of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

154.  Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made
and caused to be made by Defendants arising from their unlawful conduct as described herein.

## Count II

### False Claims Act 31 U.S.C. § 3729(a)(7)

155.  Relators repeat and reallege each and every allegation contained in paragraphs 1 through 124 above as though fully set forth herein.

156.  This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. §§ 3729 et seq., as amended.

157.  Through the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States, within the meaning of 31 U.S.C.
§ 3729(a)(7).

158.  As a result, monies were lost to the United States through the non-payment or non-transmittal of money or property owed to the United States by the Defendants, and other costs were sustained by the United States.

159.  By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

160.  Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every false record or statement knowingly made, used, or caused to be made or used to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

## Count III

## False Claims Act 31 U.S.C. § 3729(a)(3)

161.  Relators repeat and reallege each and every allegation contained in paragraphs 1 through 124 above as though fully set forth herein.

162.  This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. §§ 3729 et seq., as amended.

163.  Through the acts described above, Defendants, acting together in concert as each others' contractors, agents, partners, and/or representatives in selling and/or offering for sale the defective and illegal products described herein and submitting false claims, records and statements therefor without disclosing material facts about the products, were acting within the course, scope and authority of such contract, agency, partnership and/or representation for such conduct.  The Defendants conspired to defraud the United States by getting false or fraudulent claims allowed or paid, within the meaning of 31 U.S.C. § 3729(a)(3).

164.  By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

165.  Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every false claim allowed or paid through the Defendants' conspiracy to defraud the United States.

**Prayer**

WHEREFORE, Relators pray for judgment against the Defendants as follows:

1.    That Defendants cease and desist from violating the False Claims Act, 31 U.S.C. §§ 3729 et seq.;

2.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of 31 U.S.C. § 3729;

3.    That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

4.    That Relators be awarded all costs of this action, including attorneys' fees and expenses; and

5.    That Relators recover such other and further relief as the Court deems just and proper.

**Demand for Jury Trial**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a trial by jury.

Dated: June 12, 2006

HIRST & CHANLER LLP

By: _____
Michael A. Hirst, Esq.
Clifford A. Chanler, Esq.

Hirst & Chanler LLP
Wells Fargo Center
400 Capitol Mall, Suite 900
Sacramento, CA 95814
Phone: (916) 449-3905
Fax:   (916) 449-8258


TROUTMAN SANDERS LLP

By: _____
Mark E. Nagle, Esq.
D.C. Bar No. 416364

Troutman Sanders LLP
401 Ninth Street, NW
Suite 1000
Washington, D.C. 20004-2134
Tel: (202) 274-2972
Fax: (202) 654-5666

Attorneys for Relators
Whitney Leeman and Russell
Brimer